[No. S004791. Crim. No. 26425. Aug. 30, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DEAN CLARK, Defendant and Appellant.

COUNSEL

Paul G. Bower and Mary Lee Wegner, under appointments by the Supreme Court, William R. Lindsay, Daniel S. Floyd, Howard A. Jacobson, Chad S. Hummel, Karen N. Frederiksen, Barbara G. Zelkind, Shauna Weeks and Gibson, Dunn & Crutcher for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant Richard Dean Clark was convicted, following a jury trial, of the first degree murder and rape of Rosie Grover. (Pen. Code,

§§ 189, 261.)[1] The jury found true the special circumstance allegations that he committed the murder during the course of the rape (§ 190.2, subd. (a)(17)(iii)), that he inflicted bodily injury with the intent to do so (§ 1203.075, subd. (a)(1)), and that he used a deadly weapon in the commission of the murder (§ 12022, subd. (b)). The jury fixed the penalty at death. After denying the motion for modification of the penalty verdict, the court entered judgment accordingly. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. GUILT PHASE FACTS

### A. *Prosecution's Case-in-chief*

#### 1. *Introduction*

During the early morning of July 19, 1985, Rosie Grover was raped, stabbed with a sharpened screwdriver, and repeatedly bludgeoned about the face and neck with two pieces of concrete. Although the crime occurred in Mendocino County, a change of venue was granted on defendant's motion and the trial was held in Santa Clara County. Defendant was convicted of the murder.

#### 2. *The Victim, Rosie Grover*

Rosie Grover was a 15-year-old high school student at the time of her death. On July 19, 1985, she took a Greyhound bus that left San Francisco around midnight and arrived in Ukiah around 4 a.m. After unsuccessfully attempting to obtain a ride home from the bus depot, she began to walk home. Her body was found the next morning in the rocky, dry bed of Doolan Creek.

#### 3. *The Defendant, Richard Clark*

In early 1985, defendant met David Smith (Smith), a paraplegic, who hired defendant to care for him. About a month later, they moved to Ukiah. On July 18 and 19, 1985, defendant and Smith were staying with Smith's stepsister, Michelle Stevens, at 778 South State Street.

Defendant and Smith spent some part of the afternoon in a local bar, where each man drank three or four beers. Sometime that day, Smith traded

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

a small amount of methamphetamine for cocaine. They returned to Michelle Stevens's house, where both men ingested the cocaine. Although Smith had seen defendant use methamphetamine in the past, defendant did not use it in Smith's presence on July 18, 1985. Defendant, Smith, and perhaps others, smoked between two and five marijuana cigarettes.

During the evening, an argument arose between defendant and Matt Williams, Michelle Stevens's boyfriend. According to Williams, defendant "looked like he was on something" and "got kind of violent, shadow boxing around the house and throwing punches." Around 10 p.m., defendant left, announcing that he "was going to beat somebody up and rob them." Dino Stevens (Stevens), Michelle's stepbrother, left with defendant.

Stevens and defendant went to Munchie's, a pool hall located on State Street. After playing pool for 30 to 40 minutes, the men left and walked to the home of Robyn Boyd, a friend of Stevens. Robyn lived at 304 Cooper Lane, near the Greyhound depot. Stevens and defendant arrived at Boyd's house around midnight. Boyd was entertaining several friends; marijuana may have been available. The 2 men remained at Boyd's for 10 to 30 minutes. Upon leaving Boyd's, Stevens and appellant parted company.

Little evidence, other than defendant's statements to police (which will be discussed below), was presented to establish defendant's location and movements between the time he left Boyd's house and the time he entered the Ron-Dee-Voo Restaurant on July 19.

### 4. *Discovery of the Body*

About 6:15 a.m. on July 19, defendant entered the Ron-Dee-Voo Restaurant, which is located on South State Street near Doolan Creek. He was wearing mirrored sunglasses and was holding a partially empty wine cooler bottle in his hand. Defendant told Karen Mertle, a waitress, that he had found a girl in a nearby ditch. The girl was hurt "real bad" and "maybe raped." Mertle offered defendant coffee in order to "hold him there until the police arrived." Defendant handed the wine cooler bottle that he had been carrying to Mertle. She later gave the bottle to the police.

The witnesses present at the Ron-Dee-Voo that morning testified that defendant did not appear intoxicated. Several witnesses also testified that he did not appear suitably upset by his discovery.

### 5. *The Investigation*

Officer Wayne McBride of the Ukiah Police Department arrived at the restaurant at 6:34 a.m. Officer McBride had an intermittent conversation

with the defendant that lasted approximately 30 to 40 minutes. During this conversation, defendant explained how he discovered the body while taking a "shortcut" to buy cigarettes at a convenience store on State Street. He volunteered that he checked the body for a pulse and may have touched the luggage. Although defendant was wearing sunglasses and spoke rapidly and excitedly when he first met Officer McBride, the officer testified that defendant did not appear to be intoxicated, did not appear to be under the influence of methamphetamines and did not smell of alcohol.

At the scene of the crime, Detectives Fred Kelley and Edward Gall collected physical evidence. The body of Rosie Grover was partially clothed. Her jeans were buttoned, but a cloth belt was undone. Her jacket and blouse were open, exposing her bra. Her shoes and her pink tank top lay nearby. Her duffle bag and suitcase were 10 feet away from the body. Two bloody concrete blocks, the larger one weighing 18.5 pounds, lay near the body. The victim had suffered severe injuries to the head and face. Possible puncture or stab wounds were evident on the lower right portion of her abdomen.

During the search of the crime scene, a bottle of wine cooler of the same brand and flavor as the one defendant had given to Mertle was found in the victim's duffle bag.

After searching the crime scene, Kelley and Gall went to 778 South State Street. There, they received permission from David Smith to search his car. Kelley discovered a pair of Levi's 501 jeans and a sleeveless vest-type jacket on the rear seat. Blood appeared to be splattered on the legs of the jeans and wiped on the lower part of the vest. Stevens and Smith identified the clothing as that worn by defendant the previous evening.

### 6. Defendant's Statements to Police

Defendant gave three custodial statements to the police on the day of his arrest. The content of and circumstances surrounding these statements are more fully discussed later in the opinion.

Prior to his arrest, defendant spoke with Detectives Kelley and Gall. He waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and basically repeated the story that he had told Officer McBride earlier in the morning.

Following his arrest and booking, Detectives Kelley and Gall transported defendant to the hospital for a blood test. During the trip defendant confessed to killing Rosie Grover. He claimed, however, that the sexual intercourse with the victim was consensual. After the encounter, she said that she

was going to report him for rape. When she repeated this intention, he quickly decided that he would receive a less severe penalty for killing her than raping her and proceeded to do so.

Upon return to the police station, defendant agreed to provide a tape-recorded statement. Detectives Kelley and Gall and Deputy District Attorney Al Kubanis were present. After a colloquy during which defendant waived his constitutional rights, he gave a statement that differed somewhat from his prior statement. In the taped statement, defendant stated that during the previous evening he ingested eight or nine beers, several tablets of Valium, one-eighth gram of methamphetamine and several marijuana cigarettes. When describing the crime, defendant this time reported periods of time when he "blacked out."

### 7. *Physical Evidence*

The autopsy of the victim confirmed that she had been raped, stabbed and beaten. The autopsy was performed under the direction of Dr. Boyd Stephens, the Chief Medical Examiner and Coroner of the City and County of San Francisco. With respect to sexual assault, Dr. Stephens opined that the victim had suffered nonconsensual vaginal intercourse, but could not opine that sodomy had occurred. Examination of the victim's vagina revealed a laceration across the posterior aspect of the outer opening. This injury is associated with nonconsensual intercourse. No trauma to the anal opening was observed. Sperm was discovered on the outside and inside of the vagina. A "rare" sperm was found in the anus. Blood contamination in the mouth hindered attempts to locate sperm there.

Ten stab wounds were found on the body. Eight were superficial. Two deeper wounds were inflicted in the middle of the back, one of which penetrated a lung and the other the heart. The wounds could have been inflicted by a screwdriver found in Smith's car. These wounds preceded the blunt trauma injuries to the victim's head and neck.

While either of the deep stab wounds could have independently caused the victim's death, the actual cause of death was blunt trauma to the head and neck. Although Dr. Stephens was unable to determine how many blows had been struck, 19 separate areas of blunt trauma were visible. The vast majority of these trauma injuries would have independently caused death. The damage was so extensive that the victim's entire facial structure was collapsed and flattened. The two pieces of concrete found near the victim's body could have inflicted the trauma to the skull.

There was no conclusive evidence of attempted strangulation, in large part because the blunt trauma injuries obscured any symptoms that would normally have been present.

A criminalist testified about tests performed on the physical evidence. Analysis of the blood splatters on defendant's Levi's jeans revealed enzymes consistent with both the victim's and defendant's blood. Defendant's shoes were splattered with human blood. A hair found on one of the shoes was consistent with the victim's hair and inconsistent with defendant's hair.

Defendant "could not be ruled out" as the source of the semen found in the victim's panties. Pubic hair found in the panties was consistent with the sample provided by defendant.

The concrete blocks found near the victim bore traces of blood consistent with that of the victim, as well as human head and eyebrow hair.

A sharpened screwdriver was found in David Smith's car approximately a week after the murder. The screwdriver was hand-sharpened and bore traces of human blood. The quantity of blood was not sufficient to type. The screwdriver could have made the puncture marks found in the victim's jacket and blouse.

## B. *The Defense Case*

Defendant did not dispute that he killed Rosie Grover, but argued that he did not intend to kill her. He asserted that his emotional difficulties and chronic drug usage culminated in a "rage reaction" on the night of the murder. As argued by his counsel, "a person who goes into a rage [reaction] is not acting with intent."

Defendant called numerous witnesses to testify regarding his drug usage and depression. Both Kathryn Cote, a supervising case manager employed by Solano County Mental Health, and Robert Clark (Robert), defendant's brother, testified that defendant began to use drugs at an early age. Cote found defendant to be severely depressed and attributed his drug usage to this fact.

Friends testified that, in the months immediately prior to his move to Ukiah, defendant regularly ingested alcohol, marijuana and methamphetamine. Robert stated that defendant ingested drugs daily. Defendant's friends respectively testified that they had each observed defendant inject methamphetamine, on as many as five occasions. Many of these witnesses also testified to defendant's nonviolent character.

In February 1985, defendant attempted suicide by ingesting over 30 tablets of Valium. Following the suicide attempt, Robert Buley, a substance

abuse counselor with Shasta County Mental Health Agency, treated defendant. Buley testified that defendant was "heavily involved" with methamphetamine and that he was depressed and paranoid.

A Mendocino County therapist, who performed a mental status evaluation on defendant shortly after the crime, concluded that defendant was a "definite" suicide risk and should be observed. Based upon defendant's statements to him, the therapist also noted in his report that defendant was possibly in the process of detoxifying from various drugs.

Dr. Randall Baselt, a forensic toxicologist, testified regarding his analysis of a blood sample that was taken from the defendant shortly after his arrest. The analysis, performed in October of 1986, revealed traces of the metabolites of marijuana and diazepam (Valium), but no evidence of alcohol, cocaine or phencyclidine (PCP). A previous test done by a separate laboratory revealed the presence of methamphetamine. Dr. Baselt opined that the absence of traces of alcohol and cocaine was not inconsistent with ingestion of these substances. Rather, because of the decomposition rate of these drugs, he would not expect them to appear in the sample. The amount of the marijuana metabolite was consistent with the smoking of one or two marijuana cigarettes during the twenty-four hours prior to the blood extraction. The amount of the diazepam metabolite was consistent with the ingestion of "a very small dose of Valium, no more than five or ten milligrams" during the same 24-hour period. The level of methamphetamine in the blood at the time of the sample was in the middle therapeutic range, or, in other words, an amount consistent with that found in a diet pill. At the time of the murder, the amount of methamphetamine in the blood would have been in the "high therapeutic" or "low abuse" range.

Dr. Ronald Roberts, a clinical psychologist, performed a battery of tests on defendant. Dr. Roberts concluded that defendant has no neurological impairment, memory impairment, or organic disorder. Defendant has a low average intelligence quotient of 92. Defendant tested high on the psychopathic deviancy scale. Dr. Roberts also opined that defendant suffered from a deep-seated depression that he masked by using drugs. Dr. Roberts diagnosed defendant as suffering from "antisocial personality disorder." Defendant also exhibited elements of a borderline personality disorder.

Dr. David Smith, the medical director of the Haight Ashbury Free Medical Clinic, testified extensively about the effects of methamphetamine abuse. Dr. Smith described how chronic methamphetamine usage can produce a biochemical impairment of the brain. When this occurs, the extent of debilitation cannot be determined by the level of methamphetamine found in the blood, since the effect of the dosages taken over time is cumulative.

Dr. Smith described a "rage reaction" as essentially a lesser form of amphetamine psychosis in which the biochemically impaired user reacts irrationally or violently to a true sensory stimulus. A person experiencing a rage reaction acts without thought. Dr. Smith could not definitely opine that defendant was suffering a rage reaction when he committed the murder. The witness conceded during cross-examination that defendant's behavior was not the product of a rage reaction *if* he killed the victim for the goal-oriented purpose of preventing her from identifying him as her rapist.

Dr. Stephen Raffle, a psychiatrist and professor of medicine at the University of California, San Francisco, provided several opinions regarding the psychiatric disorders suffered by defendant at the time of the murder. Most significantly, Dr. Raffle expanded upon Dr. Smith's testimony by opining that defendant had suffered a rage reaction and disassociative state (i.e., a short break from reality) at the time of the crimes. Dr. Raffle also diagnosed defendant as suffering at the time of the murder from (1) a borderline personality disorder with features of an antisocial personality disorder, and (2) an organic personality syndrome and intoxication caused by amphetamine abuse. On cross-examination, Dr. Raffle conceded that his diagnosis of rage reaction and disassociative state could be invalid if defendant had lied to him about the extent of his memory lapses during the course of the murder. Dr. Raffle further conceded that inconsistencies in the versions of events that defendant related to the police and to mental health experts provided a basis for believing that defendant lied to them, and, therefore, that his memory of the killing was not impaired.

### C. *Rebuttal*

The prosecutor's rebuttal case primarily addressed the defense's expert testimony. Dr. Frederick Meyers, a professor of pharmacology at the University of California, San Francisco, testified that neither defendant's drug history nor his observed behavior at the Ron-Dee-Voo supported the rage reaction defense and that defendant was probably not under the influence of drugs or alcohol at the time that he killed Rosie Grover. Dr. Lee Coleman, a psychiatrist, took issue with many of the propositions underlying the diagnoses of the defense experts and explained potential drawbacks of psychiatric expert testimony. Dr. Coleman disagreed with Dr. Raffle's diagnoses that appellant experienced a rage reaction or disassociative state at the time of the murder.

## II. GUILT PHASE ISSUES

### A. *Motion to Suppress Clothing*

Defendant contends that the search and seizure of his clothing, found in Smith's car, violated his rights under the Fourth Amendment to the

United States Constitution and article I, section 13 of the California Constitution for two reasons: first, Smith, the owner of the car, did not have authority to consent to the search of defendant's clothing; second, the failure of the police to request defendant's permission to search his clothing vitiates Smith's consent. We conclude the search of the clothing did not violate defendant's constitutional rights and that suppression of the clothing and any evidence derived from it was not required.[2]

The Mendocino County Superior Court, prior to the change of venue in this case, held a hearing on defendant's motion pursuant to section 1538.5. Ukiah Police Department Officers Fred Kelley, Ed Gall, Wayne McBride and Charles Durfee testified at the hearing. An audiotape cassette and a transcript of a tape-recorded statement by the defendant were also admitted into evidence. The facts relating to the search of Smith's car as presented during this hearing are as follows:

Based upon the coincidence of finding in the victim's luggage a bottled wine cooler of the same brand and flavor as the one carried by the defendant, Detective Kelley asked another officer to request that defendant return to the police station for questioning. Defendant complied with the request.

Prior to questioning defendant, Kelley and Gall went to 778 South State Street, where defendant was a guest. There, in defendant's absence, they questioned Michelle Stevens and Smith. The officers learned that defendant had returned early in the morning of July 19, but had been locked out of the house. Defendant told Stevens and Smith that he had slept in Smith's car, which was parked in front of the house. Michelle Stevens told the policemen that she did not permit any alcoholic beverages on the premises and she showed them that there were no such beverages in her refrigerator. Kelley then requested permission from Smith to search his car for "anything that might help [him] out in [his] investigation" and Smith agreed.

While searching the car, Kelley noticed a pair of jeans and a vest on the back seat. Kelley removed the clothes from the interior of the car into the sunlight and noticed what appeared to be blood spatters below the knees of the jeans and blood swipes on the vest.[3] Detective Kelley showed the clothing to Stevens and Smith, who told him that defendant was wearing the clothes when he left the house on the night of the murder. Kelley seized the clothes and returned to the police department to interview defendant.

---

[2]For this reason, we need not address defendant's claims that his arrest was not based upon lawfully acquired probable cause and that his subsequent custodial statements to the police were inadmissible as the tainted fruit of the illegal arrest, since these arguments are premised upon the illegality of the search and seizure of his clothing.

[3]Subsequent chemical analysis revealed that the stains on the vest were not human blood.

Defendant concedes that the car belonged to Smith and that Smith had authority to permit Kelley to search the car. (See *United States* v. *Matlock* (1974) 415 U.S. 164, 170-171 [39 L.Ed.2d 242, 249-250, 94 S.Ct. 988] [*Matlock*]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 276-277 [256 Cal.Rptr. 96, 768 P.2d 610].)[4] Defendant argues, however, that Kelley's movement and examination of the clothes found in the car constituted a separate search for which Smith's consent was not sufficient. We disagree.

 The United States Supreme Court has explained the basis for valid third party consent to a search as "rest[ing] . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (*Matlock, supra*, 415 U.S. at p. 171, fn. 7 [39 L.Ed.2d at pp. 249-250].)[5] Thus, objects left in an area of common use or control may be within the scope of the consent given by a third party for a search of the common area. (See 3 LaFave, Search and Seizure (2d ed. 1987) § 8.5(c), pp. 299-304.)

 As the owner of the searched car, Smith unquestionably had a possessory interest in it. Smith gave the police his consent to search the car for anything that might prove helpful in the investigation of the murder. By leaving his clothes readily displayed on the seat of Smith's car, defendant assumed the risk that Smith would consent to a search of the car and its contents. Defendant simply retained no legitimate privacy interest in the clothes as against Smith or Smith's invitees. The Fourth Amendment is not violated unless a legitimate expectation of privacy is infringed. (E.g., *Illinois* v. *Andreas* (1983) 463 U.S. 765, 771 [77 L.Ed.2d 1003, 1010, 103 S.Ct. 3319].)

We have reviewed the authorities cited by defendant in support of his contrary position and conclude that none require that we reach a different result. We specifically hold that the general nature of Smith's consent explains why defendant's cause is not advanced by reliance upon *Arizona* v. *Hicks* (1987) 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149]. In that case, a bullet fired through the floor of the defendant's apartment injured a man on the floor below. The police entered the defendant's apartment without a

---

[4]The prosecutor conceded that defendant has standing to challenge the search. While we are not bound by this concession, we choose to accept it and address the merits of defendant's claims, because the standing issue was not fully aired in the trial court. For this reason only, we apply the law of third party consent to the facts of this case.

[5]In this post-Proposition 8 case, defendant's state and federal claims are reviewed under the same standard. (E.g., *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

warrant in order to search for the shooter, for other victims and for weapons. During the search, a police officer noticed two sets of expensive stereo equipment. Suspecting the equipment was stolen, the officer read and recorded the serial numbers, moving some of the equipment in order to do so. After checking the serial numbers by phone, the police officer seized certain components that indeed were stolen. The Supreme Court held that the moving of the stereo equipment was an unlawful search. The court reasoned: "But taking action, *unrelated to the objectives of the authorized intrusion,* which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry." (*Id.* at p. 325 [94 L.Ed.2d at p. 354], italics added.) By contrast in the present case, the police were granted consent to search the car for "anything" helpful to the investigation of Rosie Grover's murder. The search of the contents of the car was within the scope of the consent granted to the police. Therefore, unlike the search of the stereo equipment in *Hicks,* the search of the clothing found in Smith's car was not a separate unlawful search.

Anticipating our ruling, defendant argues in the alternative that the search was invalid because the police obtained Smith's consent as a result of "misconduct," consisting of removing defendant from the scene prior to the search and then failing to request defendant's permission to search his clothing. Defendant's argument is unpersuasive. The consent of one person with common or superior authority over the area to be searched is all that is required; the consent of other interested parties is unnecessary. (E.g., *Matlock, supra,* 415 U.S. at pp. 171, 177 [39 L.Ed.2d at pp. 249-250, 253] [roommate's consent, obtained after defendant arrested and removed from the scene, sufficient]; *People* v. *Haskett* (1982) 30 Cal.3d 841, 855-857 [180 Cal.Rptr. 640, 640 P.2d 776] [wife's consent, obtained after husband arrested and removed from the premises, sufficient].)

### B. *Motion to Suppress Defendant's Incriminating Statements*

Prior to trial and pursuant to Evidence Code section 402, defendant moved to suppress certain statements that he made to the police. The challenged statements, referred to by the parties as the "Patrol Car Statement" and the "Taped Statement," amount to confessions to murder. Defendant contends that use of the statements violated the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15, of the

California Constitution as well as the prophylactic rules set forth in *Miranda v. Arizona, supra*, 384 U.S. 436 (hereafter *Miranda*) and its progeny.[6]

### 1. *Background*

The Santa Clara County Superior Court conducted a lengthy hearing to determine the admissibility of defendant's confessions. Both documentary and testimonial evidence was received. Witnesses included Ukiah Police Officers McBride, Durfee, Gall, and Kelley and defense psychiatrist Dr. Peter Mayland. The stipulated testimony of toxicologist Dr. Randall Baselt and the audiotape cassette and transcript of defendant's Taped Statement were also received in evidence.

The evidence relating to the investigation of the crime is generally consistent with evidence presented during the section 1538.5 hearing and at trial; it will not be set forth in detail again. Rather, we recount the story told by the hearing evidence beginning at the point of defendant's first custodial interrogation.

Detectives Kelley and Gall first encountered defendant when they returned to the station from their trip to 778 South State Street. Defendant was moved from the fingerprinting room, where he had been waiting for the detectives, to the sergeant's office.

At the beginning of the conversation in the sergeant's room, Kelley advised defendant of his constitutional rights. Defendant waived his rights and stated that he would speak with the officers. Kelley and Gall were both in the room, but only Kelley asked questions. Defendant essentially repeated the story that he had told McBride at the crime scene. In response to Kelley's questioning, defendant claimed that he had bought the wine cooler a few days earlier and had taken it from Michelle Stevens's refrigerator that morning, before he left to buy cigarettes. Referring to his activities of the previous evening, defendant explained that he had played pool at Munchie's, a local bar, with Stevens until 2 a.m. and then had slept in Smith's car. He also stated that he had not changed clothes since the previous day.

Kelley accused defendant of lying. Kelley told defendant that he knew that Michelle Stevens kept no alcohol in her house and that defendant had been wearing the bloody clothing that he had found in Smith's car. Defendant replied that he no longer wished to speak with the officers and that he

---

[6]Defendant also challenges the admissibility of these statements, as well as a prior statement, referred to as the "Sergeant's Room Statement," on the ground that they were the fruit of an unlawful arrest. Because we previously concluded that the arrest was lawful, we do not consider this argument further. (See, *ante*, at p. 978, fn. 2].)

wanted to talk to a lawyer. Interrogation ceased. Kelley placed defendant under arrest for murder. Kelley asked defendant if he had an attorney. Defendant replied that he did not. Kelley asked defendant if he wanted to place a phone call. Defendant responded that he did not. The interrogation began at 10:51 a.m. and ended at 11:10 a.m.

Following the interrogation, Kelley and Gall filled out booking forms, removed appellant's clothing, and completed a rape sample kit.

About noon Gall and Kelley transported appellant to the local hospital, located about one-eighth of a mile from the police station, to obtain a blood sample. Gall was driving the car; Kelley was seated in the rear with the defendant, who was handcuffed. There was no conversation until appellant asked, "What can someone get for something like this, thirty years?" Gall responded, "Probably not unless you were a mass murderer." Gall explained during the hearing that "[i]n the years I've been a police officer and prior to that it's been my experience watching court processes, whether it is on TV or, in actual process or in a courtroom itself, I've never seen anybody serve, you know, more than seven and a half years. I have never seen anybody serve thirty years or more." Kelley testified that he knew that murder in California could be punished by death or life without possibility of parole, but did not correct Gall's remark. He testified that "[t]here was no particular reason" why he did not do so.

Fifteen to twenty-five seconds following this exchange with Gall, defendant sighed audibly and said, "I want this on the record. I'm guilty. I killed her. What do you want to know?" Kelley reminded defendant that he had requested an attorney and asked whether he still wanted to consult with a lawyer before talking to them. The complete *Miranda* warnings were not repeated at this time. Defendant replied negatively to Kelley's advisement, adding: "I just want to tell you the truth."

As they drove into the hospital parking lot, Kelley asked defendant what had happened. Defendant gave a narrative, which Kelley occasionally interrupted with questions. Defendant stated that he had met Rosie Grover early in the morning on State Street. She "came on" to him and "flashed her titty." They left for the creek bed, where they had *consensual* intercourse. Prior to the intercourse, she gave him a wine cooler which she took from her cloth bag. After they had intercourse, she threatened to accuse defendant of rape. He then choked her, stabbed her in the back with a screwdriver, which he found in the creek bed, and bashed her head with a piece of concrete. He fled back to 778 South State Street and changed his bloodstained clothing in Smith's car. He then decided to return to the creek bed and report "finding"

the body to deflect suspicion from himself. Defendant's narrative was delivered in a calm, deliberate manner with no inappropriate emotional outbursts or signs of intoxication.

The officers then took defendant into the hospital for the blood sample and fingernail scrapings. At that time, defendant began to express suicidal thoughts. He told the officers that he had "nothing to live for," and if he were given the chance that he would kill himself. Detective Kelley told him that mental health care would be available for him in jail. No other mention of help or promise of help was made to the defendant at any time. Based upon defendant's comments at the hospital, Gall noted possible suicidal tendencies on defendant's booking sheet when they returned to the station.

Upon return to the station, a tape-recorded statement was taken in the office of the chief of police. Kelley, Gall and Deputy District Attorney Al Kubanis were present.

The interrogation began with Kelley advising defendant for the second time of his complete *Miranda* rights. During the course of this colloquy, defendant repeatedly remarked: "What's a lawyer going to do for me?" At points he expressed confusion and self-pity. At the end of the discussion, he stated: "Yeah, I'll talk. I don't care."

The story told during the Taped Statement is similar to the story told in the patrol car. This time, however, defendant told the police that he had ingested a couple of tablets of Valium, one-eighth gram of methamphetamine and several marijuana cigarettes, as well as more beer than he had previously revealed. He also claimed to have "blacked out" during the murder and denied remembering that he stabbed Rosie Grover with a screwdriver. In response to questioning, defendant stated that he was hungry, but otherwise was feeling all right. The Taped Statement began at 12:41 p.m. and ended at 1:16 p.m. There was no unrecorded conversation with defendant.

In addition to these facts, the trial court considered evidence bearing upon defendant's state of mind at the time of the statements. First, jail records prepared under the direction of the Mendocino County jail were admitted into evidence. These records showed that the defendant was under a suicide watch for a time after he was first incarcerated and that mental health officials had visited defendant and had also recommended observing him for possible symptoms of drug withdrawal.

Second, the stipulated testimony of Dr. Baselt was received into evidence. This testimony was consistent with his trial testimony previously described.

Dr. Baselt also opined during this hearing that, although the drugs in defendant's system might have affected defendant's judgment at the time of the statements, he could not give an opinion regarding the degree of any such impairment, because people vary in their reactions to drug combinations.

Finally, Dr. Mayland testified at length that, based upon certain psychological factors arising from defendant's childhood, life-style and poly-drug use, he possessed "significant doubts" regarding whether defendant could understand and intelligently waive his rights on July 19, 1985. Dr. Mayland also testified, however, that the observations of defendant by the police officers at the time of the statements constituted the most reliable evidence on the issue before the court. After examining certain self-serving inconsistencies between defendant's three statements under cross-examination, Dr. Mayland further admitted that if all the statements that appeared to be self-serving fabrications were indeed fabrications,[7] defendant would have possessed "moderate intellectual functioning with raggedy edges" at the time of the statements.

### 2. The Patrol Car Statement

#### a. Miranda Rights

Defendant offers several reasons why his Patrol Car Statement should be deemed inadmissible under Miranda, supra, 384 U.S. 436. We find no merit in defendant's claims.

■ Defendant first contends that Gall's response to his inquiry regarding possible penalties for "something like this" constituted interrogation in violation of Edwards v. Arizona (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 385-387, 101 S.Ct. 1880] (hereafter Edwards). In that case, the Supreme Court announced the following prophylactic rule: Once a custodial suspect invokes his right to an attorney, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or

---

[7]For example, during the Patrol Car Statement defendant stated that he stabbed Rosie Grover in the back. In response to a question by Kelley regarding the stabbing during the Taped Statement, defendant claimed that, during the Patrol Car Statement, Kelley must have brought up the subject of the stab wounds in the back and that he must have just assumed that he did it. At that time, however, Kelley had not observed the back of the body and had no independent knowledge of the stab wounds in that area of the body. A strong inference therefore arises that defendant during the Taped Statement had the reasoning ability to fabricate and had fabricated at least part of the "black out" that defendant described in the Taped Statement, but did not mention at all in the patrol car.

conversations with the police." (*Ibid.*) The trial court specifically found that Gall's statement did not constitute interrogation. We review the trial court's finding regarding whether interrogation occurred for substantial evidence or clear error. (*People v. Clair* (1992) 2 Cal.4th 629, 678 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People v. Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].) We conclude that there is substantial evidence to support the trial court's finding.

■ Interrogation has a specific meaning as used in *Miranda* and *Edwards*. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fns. omitted; accord, *People v. Clair, supra,* 2 Cal.4th at p. 679.) The Supreme Court has also recognized that "[i]n deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." (*Arizona v. Mauro* (1987) 481 U.S. 520, 529-530 [95 L.Ed.2d 458, 468-469, 107 S.Ct. 1931].) Where government actions do not implicate this purpose, interrogation is not present. (*Ibid.*)

Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response. (See *People v. Mickey, supra,* 54 Cal.3d at pp. 645, 651 [no interrogation found when police responded to defendant's question regarding the burial of his victims and the defendant subsequently lost his composure and made incriminating statements]; cf. *Rhode Island v. Innis, supra,* 446 U.S. at pp. 300-303 [80 L.Ed.2d at pp. 319-321].) ■ In this case, substantial evidence supports the conclusion that there was no reason for Gall to have known that his casual estimate of possible penalties would produce an incriminating response from this defendant. Defendant phrased his question in abstract terms and the officer responded in the same terms. The response contained no suggestion that if defendant confessed he would receive more favorable treatment, or that if he did not confess the penalties would be more harsh. Defendant was in effect told that the officer thought it was likely that the person who committed the crime, whoever that may be, would serve substantial prison time, albeit less than 30 years, whether or not

the person confessed.[8] The record does not establish that defendant was subject to "compelling influences, psychological ploys, or direct questioning." (*Arizona* v. *Mauro, supra,* 481 U.S. at p. 529 [95 L.Ed.2d at p. 468].) Rather, the record demonstrates defendant's desire to unburden himself by confessing the murder. Defendant's expression of guilt was volunteered and was not the result of impermissible police interrogation. (*Ibid.*)[9]

█ Next, defendant contends that his waiver of his *Miranda* rights in the patrol car was neither knowing, intelligent nor voluntary. (See *Miranda, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707]; accord, *Colorado* v. *Spring* (1987) 479 U.S. 564, 566, 572 [93 L.Ed.2d 954, 960-961, 107 S.Ct. 851]; *Moran* v. *Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 420-421, 106 S.Ct. 1135].) According to the Supreme Court, this inquiry has "two distinct dimensions." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [89 L.Ed.2d at pp. 420-421].) █ "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]" (*Ibid.,* quoting *Fare* v. *Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212-213, 99 S.Ct. 2560].)[10]

█ Defendant argues that his waiver was not knowing and intelligent, because he was deceived by Gall's statement as to possible punishment and it was not voluntary because Gall's statement induced him to waive his

---

[8]Contrary to defendant's argument, Gall's statement did not serve to "minimize the moral seriousness of the offense," as prohibited by *Miranda, supra,* 384 U.S. at page 450 [16 L.Ed.2d at pages 709-710], and *Rhode Island* v. *Innis, supra,* 446 U.S. at page 299 [64 L.Ed.2d at pages 306-307]. This is not a case where the police sought to convince the defendant that he was not morally responsible for his actions due to temper, mental illness or other similar causes. (*Miranda, supra,* 384 U.S. at p. 450, fn. 12 [16 L.Ed.2d at pp. 709-710].)

[9]*People* v. *Harris* (1989) 211 Cal.App.3d 640 [259 Cal.Rptr. 462], relied upon by defendant in support of his claim, is materially distinguishable. Defendant was not urged to " ' "straighten it out" ' " in this case as was the defendant in *Harris.* (*Id.* at p. 646.)

[10]Defendant cites two of our older cases for the proposition that even the "slightest pressure" exerted on the defendant is sufficient to require exclusion of his confession. (See *People* v. *Jimenez* (1978) 21 Cal.3d 595, 606 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Berve* (1958) 51 Cal.2d 286, 291 [332 P.2d 97].) The federal Supreme Court, however, has recently indicated that a similar standard enunciated in one of its older cases is no longer valid. (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 285 [113 L.Ed.2d 302, 315, 111 S.Ct. 1246].) Rather, the voluntariness of the confession must be determined by the "totality of the circumstances" surrounding the interrogation. (*Ibid.*; see also *Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [89 L.Ed.2d at pp. 421-422].)

rights and confess. He also asserts that his background and mental state rendered him especially vulnerable to inducements or promises of leniency. The trial court found that defendant's waiver of his *Miranda* rights was knowing, intelligent and voluntary beyond a reasonable doubt. After independent review of the record (*People v. Mickey, supra*, 54 Cal.3d at p. 649), we agree with the trial court's findings.

Although defendant contends that the waiver of his constitutional rights was not knowing and intelligent, he never contends that he did not understand the rights that were read to him and which he effectively invoked to terminate his Sergeant's Room Statement. ██ ██ Rather, he contends that he was misled regarding the penalties that he faced and for that reason his assessment regarding whether he should waive his rights was not knowing and intelligent.[11]

██ Defendant misunderstands the nature of the waiver required by *Miranda*. All that is required is that the defendant comprehend "all of the information that the police are required to convey" by *Miranda*. (*Moran v. Burbine, supra*, 475 U.S. at p. 427 [89 L.Ed.2d at pp. 424-425].) "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (*Id.* at pp. 422-423 [89 L.Ed.2d at pp. 421-422], fn. omitted.) The record demonstrates that defendant was aware of and understood these rights.

 ██ ██ We conclude that defendant's waiver of his *Miranda* rights in the patrol car was knowing and intelligent, whatever the applicable standard of proof.[12]

██ Defendant also contends that his Patrol Car Statement was not voluntary within the meaning of *Miranda*. He argues that his inexperience

---

[11]Defendant has no right to be advised about the penal consequences of the charges that he faces prior to interrogation. (*People v. Hill* (1992) 3 Cal.4th 959, 982 [13 Cal.Rptr.2d 475, 839 P.2d 984], cert. applied for May 1993, Supreme Ct. Dock. No. 92-8798; cf. *Colorado v. Spring, supra*, 479 U.S. at pp. 575-577 [93 L.Ed.2d at pp. 966-968] [a suspect may knowingly and intelligently waive his *Miranda* rights even if he is not told of all of the crimes about which he will be interrogated]; *Moran v. Burbine, supra*, 475 U.S. at p. 422 [89 L.Ed.2d at pp. 421-423] [defendant not entitled to "flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights"].)

[12]It is now settled that both the validity of the defendant's waiver of his constitutional rights and the voluntariness of his resulting confession must be shown by a preponderance of the evidence. (*Colorado v. Connelly* (1986) 479 U.S. 157, 168-169 [93 L.Ed.2d 473, 485-486, 107 S.Ct. 515]; *People v. Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042].) Uncertain of the law at the time of this motion, however, the parties stipulated that the

with the legal system and the level of his mental functioning at the time of the Patrol Car Statement rendered him "particularly susceptible to responding to false representations and influences." An involuntary waiver of *Miranda* rights, however, is a product of government coercion. (*Colorado* v. *Connelly, supra,* 479 U.S. at p. 170 [93 L.Ed.2d at pp. 486-487].) Taking into account the totality of the circumstances in this case, such coercion is absent. ██ ██ We find that, under any standard, the content of Gall's statement and the circumstances under which it was made were not such as to force or compel a confession from the defendant.[13] Furthermore, this court has repeatedly rejected claims of incapacity or incompetence to waive *Miranda* rights premised upon voluntary intoxication or ingestion of drugs, where, as in this case, there is nothing in the record to indicate that the defendant did not understand his rights and the questions posed to him. (E.g., *People* v. *Breaux* (1991) 1 Cal.4th 281, 301 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

### b. *Due Process*

 Defendant also contends that his Patrol Car Statement was involuntary within the meaning of the due process clauses of the federal and state Constitutions. A statement is involuntary and, thus, inadmissible if it is obtained by threats or promises of leniency, whether express or implied. (*People* v. *Benson, supra,* 52 Cal.3d at pp. 778-782; *People* v. *Thompson* (1990) 50 Cal.3d 134, 166-170 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Hogan* (1982) 31 Cal.3d 815, 838 [183 Cal.Rptr. 817, 647 P.2d 93]; cf. *Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [89 L.Ed.2d at pp. 420-421].) A finding of coercive police activity is a prerequisite for a finding that a confession was involuntary under the due process clauses of the federal or state Constitution. (*People* v. *Benson, supra,* 52 Cal.3d at p. 778; *Colorado* v. *Connelly, supra,* 479 U.S. at p. 167 [93 L.Ed.2d at pp. 484-485].)

After reviewing the record, we do not find the requisite coercion. Even though Gall's statement was not accurate, the circumstances surrounding it

---

admissibility of defendant's incriminating statements had to be shown beyond a reasonable doubt. (See *People* v. *Jimenez, supra,* 21 Cal.3d 595, 608).

[13]Defendant attempts to argue that the car trip was a coercive, psychological ploy designed to compel his confession because he was a stranger in town and did not know the purpose or estimated length of this trip. However, defendant did not rely on the purportedly coercive nature of the car trip in the trial court. The record of the suppression hearing is devoid of any questions or testimony relating to whether defendant knew the purpose of the trip or had any other information regarding the trip. When a party does not raise an argument at trial, he may not do so on appeal. (*People* v. *Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People* v. *Benson* (1990) 52 Cal.3d 754, 782, fn. 5 [276 Cal.Rptr. 827, 802 P.2d 330].) In any event, we find the argument to be without merit. At trial, Detective Kelley testified that defendant was informed of the purpose of the trip prior to leaving the station.

demonstrate none of the indicia of coercion. (See *People* v. *Thompson*, *supra*, 50 Cal.3d at p. 167; see also, *ante*, at pp. 985-986, 988.)

Gall's statement, whether considered objectively or subjectively (see *People* v. *Benson, supra*, 52 Cal.3d at p. 780), was not a promise of leniency or an inducement.[14] Viewed objectively, Gall's statement merely offered his opinion that the person who committed a crime like the one for which defendant was under arrest would serve substantial time in prison, but probably less than 30 years. There was no mention of the effect of cooperation upon the time to be served. There was no threat, promise, psychological trickery or physical violence used to prompt a confession. Nothing in the exchange between the officer and the defendant gives rise to the inference that an implied message was being conveyed. Viewed subjectively, Gall's statement was not shown to be a promise or an inducement. During the Taped Statement that followed, defendant stated that no promises or threats had been made to him by the police. Although Dr. Mayland testified that defendant was more susceptible than the average person to a suggestion that he would get a lighter punishment in return for a confession, it is clear that defendant did not view the exchange between himself and Gall as containing a promise of leniency. In light of all of the circumstances, we conclude that defendant's Patrol Car Statement was voluntary beyond a reasonable doubt.[15]

### 3. *The Taped Statement*

Defendant advances two reasons why the Taped Statement was inadmissible under *Miranda*.[16] First, defendant argues that he requested counsel prior to giving his statement, but that his request was ignored and interrogation did not cease as required by *Edwards, supra*, 451 U.S. 477. Second,

---

[14]We need not decide in this case whether a subjective standard for identifying a promise of leniency survives the Supreme Court's decision in *Colorado* v. *Connelly, supra*, 479 U.S. at pages 164-165 [93 L.Ed.2d at pages 482-483]. We do note, however, that *Connelly* states that a defendant's subjective perceptions cannot mandate the suppression of a statement unless state coercion is present.

[15]The two out-of-state cases relied upon by the defendant for the proposition that a statement will be deemed involuntary when it follows an officer's misleading statement regarding the possibility of comparatively lenient punishment for the crime committed are unpersuasive. Both *State* v. *Gard* (Minn.Ct.App. 1984) 358 N.W.2d 463 and *State* v. *Setzer* (1978) 20 Wn.App. 46 [579 P.2d 957] rely extensively upon *Bram* v. *United States* (1897) 168 U.S. 532 [42 L.Ed. 568, 18 S.Ct. 183]. The Supreme Court, however, has recently observed that the *Bram* decision "does not state the [current] standard for determining the voluntariness of a confession . . . ." (*Arizona* v. *Fulminante, supra*, 499 U.S. at p. 285 [113 L.Ed.2d at p. 315].)

[16]Defendant also contends that the Taped Statement should have been suppressed as "the tainted fruit of the involuntary patrol car confession." Because we have found that the Patrol Car Statement was voluntary, we need not address this third contention.

defendant argues that he did not understand his *Miranda* rights and, therefore, was unable to knowingly and intelligently waive them. We reject defendant's contentions.

Defendant first argues that he invoked his right to counsel while being advised of his rights. In support of his argument, defendant points to his repeated phrase "what can an attorney do for me" and his comment "I'm really confused, I mean, I don't know what the fuck to do."

Whether defendant invoked his right to counsel is a factual question, which is reviewed by this court for substantial evidence or clear error. (E.g., *People* v. *Hayes* (1985) 38 Cal.3d 780, 784 [214 Cal.Rptr. 652, 699 P.2d 1259] [invocation of right to counsel is a factual question]; *People* v. *Bestelmeyer* (1985) 166 Cal.App.3d 520, 526 [212 Cal.Rptr. 605] [invocation of right to counsel is a factual question]; but see *Robinson* v. *Borg* (9th Cir. 1990) 918 F.2d 1387, 1390 [whether defendant's words constitute a request for counsel is a legal determination reviewed de novo].) The record supports the trial court's implicit finding that the defendant did not invoke his right to counsel during this colloquy.[17]

It is true, as defendant urges, that a request for counsel "need not be unequivocal to invoke defendant's right to call a halt to questioning." (E.g., *People* v. *Thompson, supra,* 50 Cal.3d at p. 165.) Defendant cites numerous cases which have found equivocal language sufficient to invoke the right to counsel. In context (*People* v. *Thompson, supra,* 50 Cal.3d at p. 165), however, defendant's statements in this case did not amount even to an equivocal assertion of his right to counsel.

It is clear from the record that defendant evaluated whether he should waive his rights and give the Taped Statement. He spoke of the reasons that would prompt him to do so. He asked questions to help him evaluate his position. The interrogators, while avoiding giving the defendant detailed legal advice, provided information responsive to his questions. The interrogators were at all times courteous, polite, and restrained. Although the defendant was aware from his experience that morning in connection with the Sergeant's Room Statement that if he invoked his rights the questioning would cease, he did not do so. In fact, notwithstanding his vocalized soul-searching, the record reflects that he waived his rights three times prior to the initiation of substantive questioning.

With respect to the specific comments to the effect of "what can a lawyer do for me," a review of the transcript and the cassette, including the tone and

---

[17]Applying de novo review, we would reach the same result: defendant did not invoke his right to counsel, but rather, effectively waived that right prior to giving the Taped Statement.

inflections of defendant's voice, reveals that defendant's "questions" were rhetorical in nature and linked to his repeated explanation of the reasoning behind the waiver of his rights. (See *People v. Thompson, supra,* 50 Cal.3d at p. 165.) Defendant repeatedly explained that he did not feel that a lawyer could assist him since he was guilty and previously had revealed this fact to the police. For these reasons, he was willing to talk without assistance of counsel.

Similarly, defendant's statement regarding his confusion, both in context and on its face, cannot be reasonably construed as a request for counsel. The Taped Statement demonstrates that defendant understood that he had a right to counsel; it is irrelevant, in the absence of coercion, that he had difficulty in deciding whether to exercise his right.

Even assuming that these comments, separately or in tandem, could be construed as an ambiguous request for counsel, the conduct of the interrogators was proper and defendant's subsequent waiver was valid.[18] When the person under interrogation makes an ambiguous statement that could be construed as a request for counsel, the interrogators may clarify the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights. (E.g., *People v. Carey* (1986) 183 Cal.App.3d 99, 102, 103 [227 Cal.Rptr. 813], cert. denied (1987) 479 U.S. 1089 [94 L.Ed.2d 153, 107 S.Ct. 1297]; *United States v. Fouche* (9th Cir. 1989) 776 F.2d 1398, 1404-1405.) The colloquy regarding defendant's rights consisted of such permissible clarification. The interrogators did not ask defendant substantive questions until defendant's position was clarified and a valid waiver was obtained. Moreover, no coercive tactics were employed in order to obtain defendant's *Miranda* waiver.

We next turn to defendant's contention that his waiver of his rights was not knowing and intelligent. Defendant provides two reasons why his waiver was deficient. First, he argues that he had an insufficient understanding of the function of an attorney. Second, he renews his argument that his mental state rendered him incapable of providing a knowing and intelligent waiver of his rights. The trial court explicitly found that defendant did knowingly and intelligently waive his rights prior to giving the Taped Statement. After an independent review of the record (*People v. Mickey, supra,* 54 Cal.3d at p. 649), we agree.

The *Miranda* warnings given to the defendant at the beginning of the Taped Statement were complete and accurate. Again, all that is required for

---

[18]Defendant does not appear to argue that his statements were an unambiguous request for counsel. Based upon the record, we find that such an argument would have been futile.

a valid waiver of these rights is that the defendant understand that he could stand mute, request a lawyer and that anything he did choose to say could be used against him to secure a conviction. (*Moran* v. *Burbine, supra,* 475 U.S. at pp. 422-423 [89 L.Ed.2d at pp. 421-422].) The record reveals that defendant understood these rights. In fact, the record reveals that defendant was provided with more information than the Constitution requires in order to assist him in evaluating the wisdom of waiving his rights.

Defendant contends, however, that his waiver was deficient because he did not adequately comprehend what a lawyer could do for him. There is no constitutional requirement that the defendant understand the types of assistance that an attorney can provide. (Cf. *Patterson* v. *Illinois* (1988) 487 U.S. 285, 293-294 [101 L.Ed.2d 261, 272-274, 108 S.Ct. 2389] [addressing Sixth Amendment right to counsel].) Unadorned *Miranda* warnings, which the defendant received, sufficed to give defendant all the information necessary for him to make a knowing and intelligent choice to waive or invoke his right to counsel. (Cf. *ibid.; Moran* v. *Burbine, supra,* 475 U.S. at pp. 422-424 [89 L.Ed.2d at pp. 421-423].)

Defendant was not only provided with the information necessary for him to make an informed decision to waive his rights, but the record reveals beyond a reasonable doubt that he comprehended this information. As we have previously stated, we have reviewed all of the evidence relating to the defendant's mental state at the time the Taped Statement was taken, reviewed the transcript of the statement and listened carefully to the audiocassette tape-recording of the statement. Defendant understood and effectively invoked his *Miranda* rights earlier that day. At the time of the Taped Statement, he was thinking rationally enough to provide the date when Detective Kelley could not remember it. The addition to his partially exculpatory story of his blackout during the crime, as well as other favorable embellishments, also lead us to conclude that defendant was not so mentally impaired as to be unable to make a valid waiver of his rights. We recognize that the defendant felt a degree of hopelessness regarding the situation in which he found himself as well as self-pity arising from his unfortunate family life. At points in the initial colloquy, he expressed some confusion regarding what he should do. Nevertheless, we find beyond a reasonable doubt that defendant was capable of understanding and did understand his *Miranda* rights. Therefore, we conclude that defendant's waiver was knowingly and intelligently made. (*People* v. *Breaux, supra,* 1 Cal.4th at p. 301.)

C. *Motion to Suppress Analysis of Defendant's Blood*

 Defendant contends that the Mendocino County Superior Court violated his rights under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution by failing to

suppress the results of tests performed on the sample of his blood that was drawn shortly after his arrest. We conclude that the results of the blood tests were properly admitted.

 We need not address the merits of defendant's contentions relating to the existence or absence of probable cause to draw defendant's blood at the time it was drawn, because we conclude that the doctrine of inevitable discovery would validate the lower court's ruling in any event.[19]

 As the Attorney General persuasively argues, approximately 30 minutes after defendant's blood was drawn, defendant gave the Taped Statement in which he admitted that he had ingested several different drugs on the night of the murder, including Valium, methamphetamine, marijuana, and alcohol. The Taped Statement was legally obtained. As a result of defendant's revelations concerning his drug usage on the night in question, the police inevitably would have drawn defendant's blood. Furthermore, following these revelations there was probable cause to draw defendant's blood and exigent circumstances creating an exception to the warrant requirement were also present since defendant's body was metabolizing the evidence and delay could have resulted in destruction of the evidence sought. (See *Schmerber* v. *California* (1966) 384 U.S. 757, 770-771 [16 L.Ed.2d 908, 919-920, 86 S.Ct. 1826].)

We recognize that metabolization of the substances in defendant's bloodstream would have continued in the 30 minutes to an hour between the time that defendant's blood was actually extracted and the time it inevitably would have been extracted following his Taped Statement. It is common, however, for experts to take into account the metabolization rate of a substance and extrapolate from the amount of a substance in a blood sample to arrive at an opinion regarding the amount of the substance in the blood at a critical point in time. Indeed, the expert testimony in this case was based upon this methodology. The expert testimony on the metabolization rates of the drugs detected in defendant's blood sample supports the Attorney General's argument that the blood sample that inevitably would have been drawn following the Taped Statement would have provided essentially the same information revealed by the blood sample that was actually drawn.

[19]In the Mendocino County Superior Court, little time was devoted by either party to explaining the reasons why the court should grant or deny the motion to suppress the results of defendant's blood tests. The doctrine of inevitable discovery was not argued by either side. Nevertheless, as we have previously recognized, "[t]o close our eyes to the clear applicability of the inevitable discovery doctrine would run contrary to the settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning. [Citations.]" (*Green* v. *Superior Court* (1985) 40 Cal.3d 126, 138 [219 Cal.Rptr. 186, 707 P.2d 248].) Furthermore, Government Code section 68081 is not implicated by our decision, because the arguments found in the brief filed by the Attorney General provide a sufficient basis for our reliance upon the inevitable discovery doctrine.

For these reasons, we conclude that the trial court's ruling was correct under the doctrine of inevitable discovery. (See, e.g., *Nix* v. *Williams* (1984) 467 U.S. 431 [81 L.Ed.2d 377, 104 S.Ct. 2501]; *Green* v. *Superior Court, supra,* 40 Cal.3d at pp. 136-139; *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665 [145 Cal.Rptr. 795]; cf. *People* v. *Siripongs* (1988) 45 Cal.3d 548, 568-569 [247 Cal.Rptr. 729, 754 P.2d 1306].)

### D. *Conflicts of Interest*

Defendant argues that his rights under the Sixth and Fourteenth Amendments of the federal Constitution and article I, section 15 of the California Constitution were violated by various conflicts of interest. Specifically, defendant complains that: (1) a conflict was created when Susan Massini, his first public defender, ran for and won the office of county district attorney during the time she represented him; (2) after the recusal of the district attorney's office following the election, a conflict was created when the court permitted a deputy district attorney to consult with the Attorney General's office, which had substituted as prosecutor for this case; (3) conflicts existed due to previous representation of certain prosecution witnesses by the Mendocino County Public Defender; and (4) the court failed to obtain valid waivers from defendant of any of these conflicts. For reasons explained below, we find no conflict requiring reversal.

#### 1. *General Principles*

"Included in the right to the effective assistance of counsel is 'a correlative right to representation that is free from conflicts of interest.' [Citations.]" (*People* v. *Bonin* (1989) 47 Cal.3d 808, 834 [254 Cal.Rptr. 298, 765 P.2d 460]; accord, *People* v. *Hardy* (1992) 2 Cal.4th 86, 135 [5 Cal.Rptr.2d 796, 825 P.2d 781].) We have repeatedly recognized that such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his [or her] responsibilities to another client or a third person or by his [or her] own interests. [Citation.]" (*People* v. *Bonin, supra,* 47 Cal.3d at p. 835; accord, *People* v. *Hardy, supra,* 2 Cal.4th at p. 135.)

The standard for obtaining relief under the Sixth Amendment based upon a conflict of interest depends upon whether the defendant objected to the conflict at trial. Where a trial court requires the continuation of conflicted representation over a timely objection, reversal is automatic. (*Holloway* v. *Arkansas* (1978) 435 U.S. 475, 488 [55 L.Ed.2d 426, 436-437, 98 S.Ct. 1173].) On the other hand, "'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his

lawyer's performance.' [Citations.] The Court in [*Cuyler* v.] *Sullivan* [(1980) 446 U.S. 335, 348 (64 L.Ed.2d 333, 346-347, 100 S.Ct. 1708)] made clear that such a defendant must 'show[] that his counsel actively represented conflicting interests,' and 'the *possibility* of conflict is insufficient to impugn a criminal conviction.' [Citation.]" (*People* v. *Easley* (1988) 46 Cal.3d 712, 724 [250 Cal.Rptr. 855, 759 P.2d 490], italics in original.)

"Under our state Constitution, '[w]e have applied a somewhat more rigorous standard of review.' (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 104 [197 Cal.Rptr. 52, 672 P.2d 835].) Regardless of an objection, "even a potential conflict may require reversal if the record supports "an informed speculation" that appellant's right to effective representation was prejudicially affected. Proof of an "actual conflict" is not required.' (*Id.*, at p. 105.)" (*People* v. *Cox* (1991) 53 Cal.3d 618, 654 [280 Cal.Rptr. 692, 809 P.2d 351].)

As we explained in *People* v. *Easley*, *supra*, 46 Cal.3d at page 725, "[i]t is important to recognize that 'adverse effect on counsel's performance' under [*Cuyler* v.] *Sullivan*, *supra*, 446 U.S. at pages 348 and 350 [64 L.Ed.2d at pages 346, 348], is not the same as 'prejudice' in the sense in which we often use that term. When, for example, we review a 'traditional' claim of ineffective assistance of counsel (i.e., one involving asserted inadequate performance as opposed to 'conflicted' performance), we require the defendant to show a reasonable probability that the *result* (i.e., the disposition) would have been different. [Citations.] . . . As we suggested in *Mroczko*, *supra*, *Sullivan* requires an inquiry into whether the record shows that counsel 'pulled his punches,' i.e., failed to represent defendant as vigorously as he might have had there been no conflict. [Citation.]"

Under our "somewhat more rigorous" state standard, a showing that the alleged conflict prejudicially affected counsel's representation of the defendant is also required. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 1005, 1014 [232 Cal.Rptr. 132, 728 P.2d 202] ["some grounds to believe that prejudice occurred must be discernible"]; *People* v. *Castillo* (1991) 233 Cal.App.3d 36, 62 [284 Cal.Rptr. 382] [any "informed speculation" of prejudice from conflict dispelled by examination of the trial record]; *People* v. *Marshall* (1987) 196 Cal.App.3d 1253, 1257-1258 [242 Cal.Rptr. 319] ["existence of even a potential conflict of interest must be accompanied by some evidence of ineffective representation before reversal is required"].)

With these principles in mind, we turn to defendant's specific claims.

2. *Alleged Conflicts Resulting From the Campaign, Election and Recusal*

a. *Background*

The Mendocino County Public Defender, Susan Massini (Massini), personally represented the defendant from the inception of this case. At Massini's request, Joseph Allen (Allen), an experienced capital defense lawyer, was appointed assistant attorney pursuant to section 987.2. Both Massini and Allen played active roles in the defense.

At a time not disclosed in the record, Massini decided to run for Mendocino County District Attorney. The record does not indicate whether Massini's campaign was discussed with the defendant.

Massini was elected district attorney in June 1986. She took office on January 5, 1987.

On June 25, 1986, a few weeks after the election, Allen moved to recuse the district attorney's office from prosecuting defendant's case. On July 21, 1986, the court granted the motion. The Attorney General was substituted as prosecutor.

To place these events in the context of the trial, jury voir dire began on October 20, 1986. Presentation of evidence began on March 9, 1987.

b. *The Campaign*

 Defendant did not register any objection in the trial court to Massini's representation. Therefore, contrary to defendant's assertions, the automatic reversal rule enunciated in *Holloway* v. *Arkansas, supra,* 435 U.S. 475 (*Holloway*), is inapplicable to this case. (*People* v. *Easley, supra,* 46 Cal.3d at pp. 724; *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346-347, 100 S.Ct. 1708].)

Further, defendant's assertions of an actual conflict with Massini during her campaign are unpersuasive. On this record, we do not find that Massini's personal interest in winning the election for district attorney threatened her loyalty to defendant. It is not the law that a public defender creates a conflict of interest merely by seeking employment with the district attorney's office or even by campaigning to assume that office while continuing to represent criminal defendants. (*People* v. *Marshall, supra,* 196 Cal.App.3d at p. 1257 [defense counsel's acceptance of employment with district attorney does not

require finding of actual conflict of interest].) Any conflict between an attorney's personal interest in obtaining employment and his or her client's interest in loyal and effective representation is too attenuated to impute a violation of professional ethics in each such case.

Moreover, the record does not support a conclusion that Massini's alleged conflict of interest adversely affected defendant's representation.[20] Defendant was also represented by Allen during Massini's campaign.[21] Allen did not suffer from any alleged conflict of interest and was not an employee of Massini. Allen was an experienced death penalty and criminal defense attorney. He appeared for defendant during the motions to suppress and his name appeared on the numerous pretrial motions along with Massini's name. ▆▆▆ ▄ ▄ Allen's participation in the defense supports our conclusion that the defense was neither constitutionally inadequate nor tainted by the alleged conflict.[22] ▆▆▆ Allen was in a unique position to observe whether Massini's representation of defendant was adversely affected as a result of her campaign. Allen's silence regarding any deficiencies in his cocounsel's representation of their mutual client reinforces our conclusion, which is based on our review of the record, that Massini's representation of defendant was not adversely affected by her personal interest in winning the election.

Nevertheless, defendant urges two examples of instances where Massini's representation was impaired by the conflict of interest. First, defendant points out that his motion to suppress did not specifically argue that Detective Kelley's search of the clothing found in Smith's car constituted an impermissible independent search. This argument, however, lacks merit. (See, *ante,* at pp. 979-980.) This lack of merit, rather than the conflict of

[20]During her campaign, it was apparent that if Massini won the election a conflict would result. This potential conflict does not affect the outcome of this case, since it did not prejudicially affect the representation received by defendant.

[21]Defendant points out that Massini handled the preliminary hearing prior to Allen's appointment. We reviewed the transcript of the preliminary hearing and are satisfied that Ms. Massini did not "pull any punches" in her representation of defendant during that hearing. (See *People* v. *Easley, supra,* 46 Cal.3d at p. 725.)

[22]We also reject defendant's unsupported assertion that reversal is required because he was entitled to two unconflicted counsel under section 987, subdivision (d). The appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 286-288 [168 Cal.Rptr. 603, 618 P.2d 149]; *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 428-430 [180 Cal.Rptr. 489, 640 P.2d 108].) Thus, the error, if any, of failing to ensure that defendant was represented by two *unconflicted* counsel must be judged under the standard enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], i.e., whether it is "reasonably probable" a result more favorable to the defendant would have been reached had the error not occurred. Defendant does not contend that this standard has been met and we expressly find that it has not been met.

interest, is the likely reason why this specific argument was not pursued. Another reason to explain this purported failure could be that *Arizona* v. *Hicks, supra,* 480 U.S. 321, was not decided until *after* defendant's motion was heard. Finally, Allen, not Massini, wielded the laboring oar on this motion. Defendant wisely refrains from contending that Allen's representation was adversely affected by Massini's alleged conflict of interest.

Second, defendant challenges defense counsel's failure to explicitly argue that the necessary probable cause and exigent circumstances were not present to justify the taking of defendant's blood without a search warrant. While the record does not indicate that defense counsel raised this particular argument, defense counsel did argue that the blood sample should be suppressed on Fourth Amendment grounds.

Defendant contends that his counsel's failure to raise the specific argument that he has raised on appeal must be attributed to Massini's desire not to anger the police with whom she might soon be closely working. We cannot ascertain from this record the reasons why the argument was not pursued. To impute this decision to Massini's campaign, however, would be to engage in sheer speculation. For example, we would have to assume that Allen, as well as Massini, was laboring under divided loyalties and harbored some reason not to anger the police. Such an assumption does not make sense, since Allen no longer even regularly practiced in Northern California during the time in question. On this record, we do not find that " 'it is demonstrated . . . that the nature of the defense afforded deprived the defendant of a constitutional right.' " (*People* v. *Mroczko* (1983) 35 Cal.3d at 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835], quoting *People* v. *Keesee* (1967) 250 Cal.App.2d 794, 798 [58 Cal.Rptr. 780].)

We also reject defendant's related contention that the alleged conflict warrants a per se reversal of his conviction and sentence based upon the public policy rule announced in *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363] (hereafter *Rhodes*). In *Rhodes*, this court reversed the conviction of a defendant who was represented by a part-time city attorney, who *simultaneously* discharged prosecutorial responsibilities in the county in which the defendant was tried. In so doing, this court announced a judicially declared rule of criminal procedure that city attorneys, who exercise prosecutorial responsibilities, may not represent criminal defendants. (*Id.* at pp. 186, 187.) Since *Rhodes*, however, we have recognized that in cases where the conflict between prosecutorial and criminal defense responsibilities is less direct, reversal is not required in the absence of prejudice to the representation. (*People* v. *Pendleton* (1979) 25 Cal.3d 371, 381 [158 Cal.Rptr. 343, 599 P.2d 649].) The serial nature of Massini's

criminal defense and prosecutorial responsibilities removes this case from the ambit of the *Rhodes* rule. (Cf. *People* v. *Marshall, supra,* 196 Cal.App.3d at pp. 1257-1259.)

### c. *Wood Error*

Defendant further contends that the trial court erred in failing to inquire about Massini's alleged conflict of interest and in failing to obtain a knowing and intelligent waiver from the defendant of the same. Defendant contends that these failures constitute reversible error under *Wood* v. *Georgia* (1981) 450 U.S. 261 [67 L.Ed.2d 220, 101 S.Ct. 1097].

█ As we have consistently recognized, "[w]hen a trial court knows or should know that defense counsel has a possible conflict of interest with his [or her] client, it must inquire into the matter [citations] and act in response to what its inquiry discovers [citation]." (*People* v. *Jones* (1991) 53 Cal.3d 1115, 1136 [282 Cal.Rptr. 465, 811 P.2d 757].) Failure by the trial court to make the necessary inquiry or to respond to what its inquiry reveals is reversible error only if the defendant shows "that an actual conflict of interest existed and that that conflict affected counsel's performance." (*People* v. *Bonin, supra,* 47 Cal.3d at pp. 837-838.)

In this case, we need not determine whether the trial court's failure to inquire into the circumstances surrounding Massini's campaign and continuing representation of the defendant was error. Even assuming the trial court's omission was error, defendant is not entitled to the reversal that he seeks, since the record supports neither a finding of actual conflict nor impaired representation.

### d. *Consultation Between the Attorney General's Office and the District Attorney's Office Following the Recusal*

█ Defendant argues that the trial court erred by modifying the recusal order to permit consultation and assistance by the district attorney's office to the Attorney General's office. Briefly, these modifications permitted (1) the district attorney's office to provide clerical and logistical support to the Attorney General, and (2) the Attorney General to consult with Robert Hickok (Hickok), the deputy district attorney who prosecuted the case prior to the recusal. The court specifically prohibited any direct participation by Hickok in the trial and any communication concerning the case between Hickok and Massini. We find no grounds upon which defendant would be entitled to relief.

The decision to recuse the Mendocino County District Attorney's Office is not challenged on appeal. That decision is governed by section 1424 and

requires a showing that "a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." The issue on appeal is limited to the effect of continuing contacts between the district attorney's office and the Attorney General's office following recusal.

We conclude that the recusal was not undermined by the modifications to the order. While defendant has not specified any purported harm flowing from the continuing contacts between the district attorney's office and the Attorney General's office, we assume that his objections are premised upon the possibility that confidential information was made known to the prosecution. We find no support for such a claim.

First, the modifications to the protective order incorporated safeguards protecting defendant's confidential information. The first two modifications to the recusal order provided for consultation with Hickok to end prior to the time that Massini was scheduled to assume her new office. The order as finally modified incorporated an ethical wall around Massini for purposes of this case by prohibiting Massini from discussing the case with Hickok and limiting the areas of consultation between Hickok and the Attorney General to events that occurred prior to Massini's election. These safeguards were sufficient to protect defendant's interests in the confidentiality of the communications between defendant and Massini. (See *People* v. *Hernandez* (1991) 235 Cal.App.3d 674, 680 [286 Cal.Rptr. 652]; *People* v. *Lopez* (1984) 155 Cal.App.3d 813, 827 [202 Cal.Rptr. 333].)

Second, no support exists for an inference that Massini actually violated the court's orders by breaching her ethical duties to defendant. Defendant acknowledged, by virtue of his stipulation to the recusal order as finally modified, that Massini would not violate her professional obligations by revealing his confidences or strategy or otherwise cooperating in his prosecution. (Cf. *People* v. *Chadwick* (1980) 106 Cal.App.3d 108, 116 [164 Cal.Rptr. 864].) The trial judge, who knew both Massini and Hickok, expressed his "confidence in their professional integrity and ethical judgment." "That assessment, made from a vantage point close to the circumstances and people involved, is entitled to our deference." (*People* v. *Lopez, supra,* 155 Cal.App.3d at p. 827, citing *People* v. *Conner* (1983) 34 Cal.3d 141, 149 [193 Cal.Rptr. 148, 666 P.2d 5].)

3. *The Public Defender's Representation of Prosecution Witnesses*

When Massini relinquished the position of Mendocino County Public Defender, Ronald Brown (Brown) assumed that position and became co-counsel with Allen in this case. During the course of trial, several alleged

conflicts involving Brown arose. Brown, in his capacity as Mendocino County Public Defender, previously had represented prosecution witnesses Robyn Boyd (Boyd), Smith, Stevens and Matt Williams. Brown also had personally represented Williams.

### a. *Boyd, Smith and Stevens*

Defendant correctly contends that in some circumstances a conflict of interest can result from an attorney's duty of loyalty to a client and the professional fiduciary obligations arising from the attorney's present or former representation of an opposing witness in a different proceeding. (See *Leversen* v. *Superior Court* (1983) 34 Cal.3d 530, 538 [194 Cal.Rptr. 448, 668 P.2d 755].) The record reveals, however, that no actual or potential conflict resulted from the representation of Boyd, Smith and Stevens by the public defender's office.

Brown, as an officer of the court, was in the best position to assess whether a conflict of interest existed or was likely to arise. (E.g., *People* v. *Belmontes* (1988) 45 Cal.3d 744, 776 [248 Cal.Rptr. 126, 755 P.2d 310].) Brown represented to the court that he possessed no confidential information relating to any of the three witnesses in question. (See *ibid.* [no actual or potential conflict found in similar circumstances arising in the context of firm under contract to county to be conflict public defender].) Both Brown and Allen represented to the court that the cross-examination of these witnesses would not be affected by any prior representation by the public defender's office. Furthermore, neither Brown nor his office represented any of the witnesses at the time of his or her cross-examination. Therefore, he did not have any interest in attempting to shield these witnesses from impeachment or to otherwise ensure that their testimony was well-received. (Cf. *In re Darr* (1983) 143 Cal.App.3d 500 [191 Cal.Rptr. 882].)

We reviewed the instances where defendant claims that the cross-examination of these witnesses was prejudicially deficient. After doing so, we find no reason to conclude that the alleged conflicts adversely affected defendant's representation.

### b. *Williams*

The purported conflict arising from prior representation of Matt Williams is more troubling. The public defender's office had represented Williams on several juvenile charges during time periods when neither Allen nor Brown was associated with the office. Brown also had personally represented Williams in connection with a charge of receiving stolen property. This representation began in February of 1986, prior to the time that

Brown became the public defender and commenced work on defendant's case.

Upon learning that Williams would likely be a witness in defendant's case, Brown sought guidance regarding how to proceed with representation of his clients from the Mendocino County Superior Court. He was advised to terminate his representation of Williams, to refrain from disclosing to Allen any confidential information about Williams, and to arrange for Allen to conduct Williams's cross-examination.

Unlike the other prosecution witnesses discussed above, Brown did personally represent Williams and was in possession of attorney-client information. Therefore, although Brown had withdrawn from his representation of this witness, he likely would have been in a situation of divided professional duties if he had cross-examined Williams or assisted in that cross-examination. (See *Leversen* v. *Superior Court, supra*, 34 Cal.3d at p. 538.)

Brown, however, did not cross-examine this witness; Allen did. Allen was not in a position of conflict with respect to this witness. Both attorneys as officers of the court represented that Brown did not provide Allen with any confidential information obtained from or relating to Williams.[23] Sworn representations have been held to be effective in assuring the court that insulation of prior confidential communications from present representation has occurred and will continue to occur. (See also *People* v. *Lopez, supra*, 155 Cal.App.3d at p. 827; *People* v. *Hernandez, supra*, 235 Cal.App.3d at p. 680.)

Allen also represented to the court that Brown's conflict would not affect his cross-examination of the witness. Allen was in the best position to make this determination. (*People* v. *Belmontes, supra*, 45 Cal.3d at p. 776.) Upon reviewing the record, we have no difficulty crediting Allen's representation. We cannot find or hypothesize any failing on Allen's part that could be attributable to any information that Brown may have received from Williams or from any solicitude Brown may have felt for his former client. There was simply no adverse effect on defendant's representation resulting from Brown's potential conflict of interest.[24]

---

[23]Even if Brown had breached his ethical duties by so doing, we do not see how such action, as serious as it might have been, would have worked to the detriment of defendant.

[24]Defendant contends that the conflicts reviewed herein deprived him of his right to two appointed counsel pursuant to section 987, subdivision (d). For the same reasons this argument was rejected previously (see, *ante*, p. 997, fn. 21), it must be rejected in this context also.

### c. *Wood Error*

Defendant contends that the trial court committed *Wood* error in connection with the above mentioned alleged conflicts of interest. (*Wood* v. *Georgia, supra,* 450 U.S. 261.) Again, we need not determine whether the trial court's inquiry into or the defendant's waiver of the alleged conflicts was sufficient. Assuming error in this regard, defendant fails to demonstrate with respect to any one of the purported conflicts of interest both the existence of an actual conflict and an adverse effect on his representation. Therefore, defendant is not entitled to reversal on this ground. (*People* v. *Bonin, supra,* 47 Cal.3d at pp. 837-838.)

### E. *Admission of Tape-recorded Statement of Defendant's Refusal to Provide Handwriting Exemplar*

Defendant next contends that the admission into evidence of a tape-recorded statement, in which he refused to comply with a court order to provide a handwriting exemplar, violated his rights under the Fifth and Sixth Amendments to the federal Constitution. The handwriting exemplar was sought in an attempt to further link the bloodstained jeans to defendant by matching his handwriting with notes found in the pockets.

Preliminarily, we observe that defendant's claim has been waived. (Evid. Code, § 353, subd. (a).) At trial defendant objected to the introduction of the tape on the grounds of relevance and prejudice.[25] Appellant did not raise his constitutional claim.

Moreover, we would reject this claim on the merits even if it were not procedurally barred.[26] Compulsion of a handwriting exemplar is permissible under the Fifth Amendment. (*Gilbert* v. *California* (1967) 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1182-1183, 87 S.Ct. 1951].) The taking of an exemplar is not a " 'critical' stage of the criminal proceedings entitling [defendant] to the assistance of counsel." (*Id.* at p. 267 [18 L.Ed.2d at p. 1183].) Furthermore, the refusal of a defendant to provide an exemplar in violation of a court order is admissible evidence of the defendant's consciousness of guilt. (See *People* v. *Ellis* (1966) 65 Cal.2d 529, 536-539 [55 Cal.Rptr. 385, 421 P.2d 393] [voice sample]; *South Dakota* v. *Neville* (1983) 459 U.S. 553, 560-566 [74 L.Ed.2d 748, 756-761, 103 S.Ct. 916] [blood test].)

Defendant nevertheless insists that the manner in which the tape-recorded statement was elicited constituted both impermissible interrogation (*Rhode*

---

[25]Defendant does not renew his objections on these grounds in this court.

[26]Because we find no merit to defendant's claim, we conclude that trial counsel was not ineffective for failing to object during trial to the tape-recording on constitutional grounds.

*Island* v. *Innis, supra,* 446 U.S. 291; *Edwards, supra,* 451 U.S. 477) and the deliberate elicitation of an incriminating statement in violation of the Sixth Amendment right to counsel (e.g., *Brewer* v. *Williams* (1977) 430 U.S. 387, 401 [51 L.Ed.2d 424, 437-538, 97 S.Ct. 1232]). The record does not support these contentions.

The record shows that Michael Prodan (Prodan), a special agent for the California Department of Justice, contacted defendant in jail. A defense investigator was also present. Prodan requested the exemplar and explained that the court had ordered defendant to produce it. As he was required to do (*People* v. *Ellis, supra,* 65 Cal.2d at p. 539), Prodan advised defendant of the adverse evidentiary consequences of refusing to comply with the order. Prodan confirmed that defendant understood these consequences and that he nevertheless did not wish to produce the exemplar. At several points, defendant remarked that he did not see why he should assist the district attorney in "put[ting him] away." During the colloquy, Prodan did not engage in impermissible interrogation or deliberately attempt to elicit incriminating statements from defendant. The spontaneous or gratuitous comments made by defendant during his exchange with Prodan cannot be attributed to Prodan's permissible attempt to obtain the handwriting sample. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1224 [14 Cal.Rptr.2d 702, 842 P.2d 1].)[27]

### F. *Admission of Defense Psychiatrist's Pretrial Testimony*

Defendant next challenges the trial court's ruling permitting the prosecutor to impeach the testimony of his trial experts with the testimony, given at a pretrial hearing to suppress defendant's incriminating statements, of Dr. Peter Mayland, a defense psychiatrist. Defendant claims that this decision violated his federal and state constitutional rights to counsel and against self-incrimination, as well as state laws governing the attorney-client privilege. We find no error in the court's ruling.

#### 1. *Background*

Dr. Peter Mayland (Mayland) was appointed to assist the defendant and his counsel in investigating a defense based upon the defendant's mental state at the time of the crimes. (Evid. Code, §§ 730, 1017.) Mayland assisted defense counsel throughout the course of preparation for and during the trial.

---

[27]We find neither legal nor factual support for defendant's contention that introduction of the tape violated his constitutional rights because his "refusal to provide a handwriting exemplar was wholly unrelated to the substantive counts with which he was charged." In particular, we conclude that neither *People* v. *Hess* (1970) 10 Cal.App.3d 1071 [90 Cal.Rptr. 268, 43 A.L.R.3d 643] nor *United States* v. *Nix* (2d Cir. 1972) 465 F.2d 90 supports defendant's claim for exclusion of the tape on constitutional grounds.

As previously noted, the defense called Mayland as a witness during the pretrial hearing on the motion to suppress defendant's confessions. Mayland testified that he harbored "significant doubt" that appellant could have voluntarily waived his constitutional rights prior to making his incriminating statements to the police. He testified that he first met defendant approximately two days after the murder at the request of defendant's counsel. He continued to see the defendant on a weekly basis for approximately one or two hours a visit. He testified about his impressions of the defendant during their meetings. On at least two separate occasions, the defendant had provided detailed accounts of the crimes. Under cross-examination, Mayland recreated defendant's accounts of the crimes, using his notes to refresh his recollection. These notes were produced to the prosecutor.

At trial, the defense was that defendant was suffering from a "rage reaction" at the time of the crimes that prevented him from formulating the requisite intent to kill. Defendant called several experts to testify in support of his defense. Mayland was not called to testify at trial. The prosecution sought to impeach the reliability of the defense experts' conclusions by referring to various aspects of defendant's statements to Mayland.

After extensive briefing and argument on this subject, the trial court concluded that the prosecutor could use defendant's statements to Mayland to impeach the defendant's experts. Specifically, the trial court ruled that the "tendering of the psychiatric defense" waived any Fifth and Sixth Amendment privileges. The trial court also ruled that defendant had waived the statutory attorney-client and psychotherapist-patient privileges.

### 2. *Waiver of Privileges*

Since Mayland was appointed to assist defendant's counsel under section 1017, all communications between defendant and Mayland were protected by two distinct privileges: the psychotherapist-patient privilege and the attorney-client privilege. (Evid. Code, §§ 952, 954, 1010-1027; *People* v. *Clark* (1990) 50 Cal.3d 583, 619-623 [268 Cal.Rptr. 399, 789 P.2d 127]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1060, fn. 11 [251 Cal.Rptr. 757, 761 P.2d 680].) Defendant correctly concedes that at the time he tendered his mental defense at trial, he waived the applicable psychotherapist-patient privilege. Defendant argues, however, that the protection of the attorney-client privilege was never waived.

The Attorney General asserts that defendant waived the attorney-client privilege protecting his statements to Mayland when he called Mayland to testify during the suppression hearing. The Attorney General is correct. By

calling Mayland to the stand during the suppression hearing, defendant manifested an intent that his communications with Mayland be revealed to third parties and that the attorney-client privilege be waived. (See, e.g., *People* v. *Haskett* (1990) 52 Cal.3d 210, 243 [276 Cal.Rptr. 80, 801 P.2d 323].)

Defendant counters that, under the circumstances of this case, the testimony in question was impermissibly compelled in violation of the federal and state Constitutions. Defendant first urges that the statute governing the waiver of the attorney-client privilege specifically excepts compelled statements from its scope. Evidence Code section 912, subdivision (a) states in relevant part that the attorney-client privilege "is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone."[28] Relying primarily upon *Simmons* v. *United States* (1968) 390 U.S. 377, 393-394 [19 L.Ed.2d 1247, 1258-1259, 88 S.Ct. 967] (hereafter *Simmons*), defendant argues that Mayland's testimony was coerced or compelled when defendant proffered it in order to protect his Fifth Amendment rights.

In *Simmons* the United States Supreme Court established a rule of use immunity for a defendant's testimony in a suppression hearing. In that case, the defendant was charged with armed robbery. A critical piece of evidence against defendant was a suitcase containing implements and fruits of the robbery. The suitcase was seized by the police without a warrant during a search of the home of defendant's mother. At a suppression hearing, the defendant testified that he owned the suitcase in order to establish his standing to assert his Fourth Amendment right to exclude this evidence. The suppression motion was denied and defendant's testimony regarding ownership of the suitcase was admitted at trial to prove his guilt. (*Simmons, supra,* 390 U.S. at pp. 379-381 [19 L.Ed.2d at pp. 1251-1252].)

The Supreme Court ultimately ruled that defendant's testimony at the suppression hearing was compelled within the meaning of the Fifth Amendment and could not be used at trial to prove his guilt. (390 U.S. at pp. 393-394 [19 L.Ed.2d at pp. 1258-1259].) The high court reasoned defendant should not be placed in the position of being forced to sacrifice one constitutional right (the protections of the Fifth Amendment's self-incrimination clause) in order to attempt to vindicate another constitutional right

---

[28]Defendant also relies upon Evidence Code section 912, subdivision (c) to shield Mayland's pretrial testimony. This subdivision states: "A disclosure that is itself privileged is not a waiver of any privilege." Defendant cites no authority for the applicability of this subdivision to the facts of this case. After consideration, we find the subdivision does not aid defendant's position.

(the Fourth Amendment's prohibition on unreasonable searches and seizures). (390 U.S. at pp. 393-394 [19 L.Ed.2d at pp. 1258-1259].)

This court has also sought to ameliorate the difficult choices facing defendants who wish to testify in pretrial proceedings. We have extended use immunity to defendants' pretrial testimony in probation revocation hearings and juvenile status hearings that occur before trial. (*People* v. *Coleman* (1975) 13 Cal.3d 867, 889 [120 Cal.Rptr. 384, 533 P.2d 1024]; *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 809, 811 [210 Cal.Rptr. 204, 693 P.2d 789].)

Neither defendant nor the Attorney General provided as authority any case in which use immunity was granted for the testimony of a psychiatrist at a pretrial suppression hearing. After reviewing the policies underlying such use immunities, we decline to find the *Simmons* rule applicable to the situation at hand. (Cf. *People* v. *Haskett, supra,* 52 Cal.3d at p. 244 [rejecting request for use immunity during retrial to bar use of psychiatric testimony offered by defense in first trial on the basis of lack of authority to support the request].)

Assuming without deciding that the waiver of the attorney-client privilege is of constitutional dimensions pursuant to the Sixth Amendment and its state counterpart, we are not faced in this case with an intolerable conflict between constitutional rights. Defendant was not compelled to waive the attorney-client privilege shielding his revelations to Mayland in order to support his suppression motion. As illustrated by the fact that mental health experts other than Mayland testified at trial, experts, who were not part of the defense team, could have been readied and called to testify during the pretrial hearing, thus obviating the asserted constitutional dilemma. The presentation of Mayland's testimony was a tactical choice that was not impermissibly coerced or compelled.

Defendant also appears to contend that his Fifth Amendment rights, as well as his Sixth Amendment rights, were infringed by the use of Mayland's testimony. This argument is without merit. First, defendant's statements to Mayland in no way were coerced or compelled, nor did they involve any state action; they were voluntarily made. (*People* v. *Clark, supra,* 50 Cal.3d at p. 620, fn. 30.) Second, defendant waived his Fifth Amendments rights with respect to statements made during psychiatric examinations requested by or agreed to by the defense when he placed his mental state in issue during trial. (*People* v. *Williams* (1988) 44 Cal.3d 883, 961-962 [245 Cal.Rptr. 336, 751 P.2d 395]; *Buchanan* v. *Kentucky* (1987) 483 U.S. 402,

421-424 [97 L.Ed.2d 336, 354-357, 107 S.Ct. 2906].)[29] Third, the jury was admonished that the statements in question could not be considered for the truth of their content. (*In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].)

In summary, defendant waived the attorney-client privilege protecting his statements to Mayland when Mayland took the stand at the pretrial hearing and revealed them. The defendant waived the psychotherapist-patient privilege and the Fifth Amendment privilege against self-incrimination when he raised his rage reaction defense at trial. At that point, Mayland's testimony was not protected by any applicable privilege or constitutional right and could be used by the prosecutor for impeachment or rebuttal. The result reached by the trial court was correct. For this reason, it is not necessary to address defendant's claims of prejudice resulting from the use of this testimony to impeach defense witnesses.

3. *Use of Mayland's Testimony for Purposes Other Than the Limited Purpose for Which It Was Admitted*

Defendant claims prejudice resulting from references by the prosecutor during his summation at both the guilt and penalty phases to statements that defendant made to Mayland. Essentially, defendant contends that the prosecutor used the statements as substantive evidence relating to the manner in which the crimes were committed, rather than for the limited purpose for which they were admitted—to illuminate the reliability of expert opinions. Our review of the arguments discloses three instances where the prosecutor's statements arguably tended to obscure the limited nature of the evidence in question.

Any harm flowing from these remarks readily could have been cured by an appropriate admonition following an objection by the defendant. Defendant objected during trial to only the comment made during the prosecutor's rebuttal statement during the guilt phase; therefore, his objections to the other two comments were waived. (*People* v. *Haskett, supra,* 52 Cal.3d at p. 244.)

---

[29]*Powell* v. *Texas* (1989) 492 U.S. 680 [106 L.Ed.2d 551, 109 S.Ct. 3146] is distinguishable. The defendant in that case was ordered by the trial court at the state's request to undergo a psychiatric examination by an appointed psychiatrist. Neither the accused nor his attorney was informed about the scope of the examination and the accused was not informed that, since the examination was required by the state, he had the right to remain silent.

With respect to the comment during rebuttal, we find no prejudice occurred.[30] The trial court sustained defendant's objection. Although the trial court failed to give a specific admonition regarding the limited use for which defendant's statements to Mayland were admitted, the trial court provided a general admonition.[31] The jury was instructed, however, both prior to the argument and again later during deliberations in response to questions regarding whether any of defendant's statements to the experts were "admissible evidence," that such testimony was not to be considered as evidence of the truth of the facts disclosed by the statements. Therefore, although a specific admonition was not immediately given by the trial court, any potential prejudice was dissipated by the trial court's instructions. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 689, fn. 17.) There is no reasonable likelihood that the jury was misled. (See *People* v. *Clair, supra,* 2 Cal.4th at p. 663.)

Further, we find that, given the repeated admonitions and instructions that the jury was not to consider defendant's statements to the defense experts for their content, no prejudice arose from any of the challenged comments by the prosecutor, whether these comments are viewed individually or cumulatively. (Cf. *People* v. *Mickey, supra,* 54 Cal.3d at p. 689, fn. 17; *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

### 4. *Questions Relating to Defendant's Meetings with Mayland*

██ Defendant also claims that certain questions by the prosecutor to defense experts Drs. Ronald Roberts and Stephen Raffle constituted prohibited comment on the exercise of a privilege pursuant to Evidence Code, section 913, because these questions contained references to meetings between defendant and Mayland. We disagree. Mayland's meetings with defendant prior to the suppression hearing were within the scope of his testimony at that hearing. Therefore, at the time the prosecution asked the questions to which defendant now objects, there was no privilege to exercise with respect to facts relating to these interviews. The prosecutor's questions did not constitute impermissible comment on defendant's exercise of a privilege.

---

[30]The prosecutor's rebuttal argument states in pertinent part: "[¶] However, what I'm saying is that a rapist does not necessarily have as his sole purpose the forced act of sexual intercourse. This man obviously had other purposes and you can tell that by the statements to Dr. Mayland, by the graphic statements of, show me some tit, bitch. And the statement of suck my Dick. Again, I'm sorry to be so graphic but it's important to point out that this man had the purpose of humiliating and demeaning that girl. That is one reason why he doesn't simply want to do the act of sexual intercourse. He wants to humiliate, demean, degrade that girl so that she is nothing. That is a standard purpose of a rapist."

[31]"THE COURT: I will give the same admonishment that I've given for all counsel. Counsel may comment on the evidence only in any reasonable deduction that may be made from the evidence. Anything else is improper. Proceed."

### 5. *Failure to Accept Defendant's Proposed Settlement of the Record*

Defendant next argues that his proposed settled record establishes that the trial court erred by admitting Mayland's testimony for any purpose during the trial. Defendant asserts that the court and the prosecutor had assured defense counsel during an unreported conference that Mayland's testimony would not be used for any purpose during trial and that trial counsel relied upon these assurances in deciding to present Mayland's testimony. Defendant contends that the trial court erred in denying his motion to settle the record, which would have substantiated this claim. Defendant also contends that he was deprived of his right to be present during all stages of the trial since he was absent from the unreported conference.

#### a. *Background*

During the appellate record correction process, appellate counsel moved for a settled statement detailing the contents of an unreported conference that occurred during the suppression hearing. The trial court accepted declarations and oral testimony from trial counsel regarding the circumstances of this alleged conference. Briefly, the defendant's trial attorneys contended that an in-chambers, unreported discussion occurred, during a recess in the Evidence Code section 402 hearing and prior to the time that Mayland was called as a witness, in which the judge, the prosecutor and both defense counsel participated. Both defense attorneys testified that the issue of whether Mayland's testimony, if he were to be called to the stand, would later be admissible at trial was discussed during this conference. Allen recalled that he announced his intent to call Mayland to testify "only if we could be assured that his testimony could not later be introduced at Mr. Clark's trial." As a result of this conversation, both defense attorneys left the chambers with the impression that the defense could call Mayland as a witness at the suppression hearing without his testimony later being used at trial. Allen subsequently admitted, however, that the trial court did not rule on this issue.

The prosecutor's recollection of the conversation differed. He testified that all counsel had been in chambers when the court inquired about the probable length of the remainder of the hearing. Defense counsel mentioned that a psychiatrist might be called as a witness. The court directed that it be informed by the end of the day as to whether the witness would be called. At that point, the prosecutor recalled counsel leaving chambers. In the court-room, outside of the presence of the judge, Allen and the prosecutor discussed the evidentiary implications of Mayland's testimony and the possible relevance of *Simmons, supra,* 390 U.S. 377. The prosecutor recalled telling

Allen that he believed that *Simmons* immunized the testimony, but that subsequent cases permitted its use as impeachment.

The trial judge stated that he did not recall any such discussion occurring in his chambers. Furthermore, he expressed skepticism that any experienced defense counsel would have relied upon an "implied decision" such as the one Allen's testimony described or would have failed to bring this under-standing to the attention of the court when the question of admissibility of Mayland's testimony was raised during trial.

The trial court denied the motion. In the course of doing so, the court found that the "*Simmons* issue" had not been discussed in the presence of the court and that the "scheduling discussion" was not material to any issue on appeal.

### b. *Discussion*

This court has repeatedly recognized that settlement of the record is primarily a question of fact to be resolved by the trial court. (E.g., *People* v. *Hardy, supra,* 2 Cal.4th at p. 183, fn. 30; *People* v. *Beardslee* (1991) 53 Cal.3d 68, 116 [279 Cal.Rptr. 276, 806 P.2d 1311].) Once settlement is ordered, the *trial court* has broad discretion to accept or reject counsel's representations in accordance with its assessment of their credibility. (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 116; *People* v. *Gzikowski* (1982) 32 Cal.3d 580, 584-585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145].) Defendant's contention that he was entitled to a hearing on this issue before a judge other than the trial judge in this case is meritless.

Moreover, the trial court did not abuse its broad discretion. The recollection of the participants conflicted regarding the content of the in-chambers discussion. Both the court and the prosecutor recalled that the "*Simmons* issue" was not raised in the court's presence. The prosecutor recalled discussing it with defense counsel outside of the presence of the court. Substantial evidence supports the trial court's findings. Further, given these findings, the trial court correctly determined that the proceeding in question was not the type that may be settled under the California Rules of Court. (*People* v. *Gzikowski, supra,* 32 Cal.3d at pp. 584-585, fn. 2.)

Appellant also contends that his absence from the in-chambers conference violated his statutory (§§ 977, 1043) and constitutional (e.g., *People* v. *Jones, supra,* 53 Cal.3d at p. 1140) right to be present during all trial proceedings. This right is not implicated, however, unless the proceed-ings bear a "reasonable, substantial relation to [defendant's] opportunity to defend the charges against him . . . ." (*People* v. *Hovey* (1988) 44 Cal.3d

Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776]; accord, *People* v. *Jones*, *supra*, 53 Cal.3d at p. 1140.) A discussion regarding the length of time for a hearing and the possible defense witnesses to be called does not implicate defendant's opportunity to defend himself. (See *People* v. *Hardy*, *supra*, 2 Cal.4th at p. 178; *People* v. *Wharton* (1991) 53 Cal.3d 522, 602-603 [280 Cal.Rptr. 631, 809 P.2d 290].)

 c. *Ineffective Assistance of Counsel*

 Defendant further argues that, by deciding to call Mayland as a witness without obtaining an order from the court or a binding commitment from the prosecutor not to use Mayland's testimony at trial, his trial attorneys rendered ineffective assistance to him. Defendant's argument is premised upon the fact that his trial attorneys testified that they never would have called Mayland to the stand if they had believed that his testimony could be used at trial.

 In order to prevail on his claim of ineffective assistance of counsel, defendant must demonstrate that (1) his attorneys' representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) his attorneys' deficient representation subjected him to prejudice, i.e., there is a reasonable probability that, but for his attorneys' failings, the result would have been more favorable to him. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687[80 L.Ed.2d 674, 693, 104 S.Ct. 2052]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698].)

 We need not decide whether defendant's trial attorneys were incompetent, because defendant is unable to demonstrate that the alleged deficiency resulted in prejudice—that is, that a more favorable result would have been reached at either the guilt or penalty phase had Mayland's testimony been excluded from the trial. First, appellant's statements to Mayland were not admitted at trial for their truth. Their sole use was for impeachment of the defense experts' opinions. Second, the use of Mayland's testimony to impeach the testimony of Drs. Smith, Roberts, and Raffle represented a small portion of the prosecutor's cross-examination of these witnesses. The testimony of these witnesses contained many contradictions. In rebuttal, the prosecutor presented additional evidence, including credible expert testimony, that cast further doubt upon the reliability of the evaluations of the defense experts. Additionally, the testimony of numerous percipient witnesses, who observed the defendant within hours following the

crime, and the low levels of drugs revealed by the blood test taken after defendant's arrest cast doubt upon defendant's "rage reaction" theory. Based upon our review of the record, we conclude that a more favorable result in either the guilt or penalty phase would not have resulted even if Mayland's pretrial testimony had never been referred to during trial.

### G. Alleged Prosecutorial Misconduct

Defendant next contends that the prosecutor's "egregious misconduct" rendered his trial fundamentally unfair in violation of his Sixth, Eighth and Fourteenth Amendment rights and their corresponding state rights. Defendant failed to object and seek a curative admonition in order to preserve these alleged points of prosecutorial misconduct for appeal. (*People* v. *Haskett*, *supra*, 52 Cal.3d at p. 244.) Nevertheless, we consider each claim on the merits in order to resolve potential ineffective assistance of counsel contentions based upon counsel's failure to object at trial.

#### 1. Cross-examination Using Hearsay Material

 Defendant complains that the prosecutor improperly cross-examined Dr. Stephen Raffle using two forms of inadmissible hearsay: a scholarly article by Dr. Bernard Diamond and a jailhouse report.

##### a. Diamond Article

The prosecutor used an article by Dr. Bernard Diamond, entitled "With Malice Aforethought," in his cross-examination of Dr. Raffle, and a portion of the article was read to the jury in the course of the examination. Section 721, subdivision (b) of the Evidence Code governs the use of scholarly works in the cross-examination of expert witnesses. This subdivision permits the use of such materials when the expert "referred to, considered, or relied upon such publication in arriving at or forming his opinion." (Evid. Code, § 721, subd. (b)(1).) In light of (1) Dr. Raffle's testimony that he considered or relied upon all of his training in arriving at his conclusions, (2) the relationship of the abolished defenses of diminished capacity and irresistible impulse to his opinion that defendant lacked the intent to commit his crimes due to a rage reaction, and (3) Dr. Raffle's former association with Dr. Diamond and his familiarity with Dr. Diamond's works, including the article in question, the cross-examination of the witness using this scholarly work was permissible. We find no violation of defendant's federal or state constitutional or statutory rights arising from the use of this article during trial.

##### b. Jailhouse Reports

 In an effort to impeach Dr. Raffle's opinion that defendant was remorseful about the death of Rosie Grover, the prosecutor asked Raffle

whether his opinion on this subject would be affected if he learned that defendant had displayed a "boastful, cocky attitude about the crime" while he was in the Mendocino County jail. At trial, the only objection to this line of questioning was that the defendant had not received a copy of the report from which this comment was taken. ▓▓▓ A defendant who does not object and seek an admonition to disregard improper statements, argument or inquiry by the prosecutor waives any such error unless the harm caused could not have been corrected by appropriate instruction or retraction. (*People* v. *Bell* (1989) 49 Cal.3d 502, 547 [262 Cal.Rptr. 1, 778 P.2d 129].) ▓▓▓ Clearly, any harm caused by the prosecutor's reference to the content of this report could have been corrected if an objection had been made at trial. Therefore, defendant's claim is waived.

Putting aside the procedural barrier, we need not decide whether the prosecutor erred, because any harm resulting from the use of the report did not result in a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 282 [266 Cal.Rptr. 834, 786 P.2d 892].) The questions regarding the jailhouse report were a very brief portion of an extensive and effective cross-examination of this witness. Moreover, the jailhouse report was not the only evidence used to question the witness's conclusions regarding the defendant's feelings of remorse for the crimes. (See, *post*, at pp. 1016-1017.) Under these circumstances, we find that no prejudice accrued to the defendant.

### 2. *Cross-examination on Irrelevant Topics*

▓▓▓ Defendant next contends that the prosecutor was permitted to cross-examine defense experts on various irrelevant and prejudicial topics, including future dangerousness, lack of remorse, and sodomy of the victim.

#### a. *Future Dangerousness*

Defendant complains that the prosecutor impermissibly inquired about his future dangerousness through questions asked of Drs. Roberts and Raffle. These questions asked whether certain of Dr. Roberts's findings could be viewed as inconsistent with specific statements by defendant to the effect that, if defendant were faced with the same set of circumstances, he would not rape and kill again.

Defendant's objections on the grounds of relevance at trial were overruled. Although the court permitted the testimony, it expressly admonished the jury: "[N]obody on this earth can predict what somebody is going to do in the future. I don't care who they are. [¶] However, you may consider such

testimony as it goes to the credibility of this witness or the credibility of any other witness testifying as an expert. You may also consider such testimony as it goes to impeach any witness but you may not consider such testimony for the truth of validating future behavior because nobody can do that. . . ." Defendant also objects to a reference to Dr. Raffle's testimony on this subject during the prosecutor's closing argument at the guilt phase. After a review of the record, we find that the inquiry and responses on this subject were permissible for impeachment purposes and that neither the questions nor comments by the prosecutor exceeded the boundaries of the court's ruling admitting the testimony.

Part of defendant's "rage reaction" defense was that his behavior on the night of the crimes was inconsistent with his character and could only be attributable to ingestion of drugs. Defendant's psychological profile and character were extensively probed during direct examination of Drs. Raffle and Roberts. Moreover, both experts opined regarding how the defendant would fare in the future in the structured environment of prison. The prosecutor's questions were drawn from inferences from Dr. Roberts's psychological profile of defendant. These inferences tended to show that defendant would commit the same crimes if confronted with the same circumstances in the future. Accordingly, the prosecutor's questions were relevant to the credibility of the defense evidence that the crimes were out of character for this defendant.

Moreover, many of Dr. Raffle's opinions depended upon the acceptance of the truth of statements made by the defendant. The prosecutor effectively demonstrated through cross-examination that many of defendant's statements may have been lies, thus undermining the foundation of Dr. Raffle's opinions. On direct examination, Dr. Raffle specifically testified that the defendant told him that if faced with the same circumstances he would not kill and rape again. The prosecutor's questions tended to cast doubt directly upon the veracity of defendant's statement, a statement that Dr. Raffle accepted as true and relied upon in reaching his opinion.

The testimony on "future dangerousness" was relevant impeachment testimony and the jury was instructed to use it only in that manner. The prosecutor committed no misconduct in eliciting this testimony. (See *People v. Mattson* (1990) 50 Cal.3d 826, 877-878 [268 Cal.Rptr. 802, 789 P.2d 983] [penalty phase].)

Finally, the prosecutor's reference to this subject during his summation was brief and related to the impeachment purpose of the testimony. In fact, the prosecutor specifically acknowledged that the jury was not to consider

future possibilities in its deliberations. The prosecutor did not commit misconduct in making this brief statement (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 82 [5 Cal.Rptr.2d 495, 825 P.2d 388]), and no prejudice could have arisen therefrom.

### b. *Lack of Remorse*

Defendant next complains that the prosecutor was permitted to attempt to elicit from Dr. Raffle on cross-examination that certain conduct of the defendant demonstrated lack of remorse for his crimes. In particular, defendant points to cross-examination based upon the Mendocino County jailhouse report discussed above and the fact that defendant carried the victim's bottle of wine cooler from the scene of the crime and drank from it.

We reject defendant's claim of irrelevance and prejudice arising from these lines of questioning. First, the defendant did not object to either line of questioning during trial on the grounds of relevance or prejudice. These objections thus were waived. (See *People* v. *Hardy, supra,* 2 Cal.4th 86, 208-209 [penalty phase]; *People* v. *Roberts* (1992) 2 Cal.4th 271, 335-336 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Second, defendant himself placed the issue of his remorse into question during Dr. Raffle's direct examination. Dr. Raffle testified several times that defendant's "guilty conscience" was significant in his diagnosis of defendant. Moreover, Dr. Raffle was asked to assess the significance of defendant's possession of the wine cooler following the crime. Dr. Raffle stated that he did not know what that fact meant. The prosecutor's questioning regarding lack of remorse under these circumstances was relevant and not prejudicial. (See *People* v. *Heishman* (1988) 45 Cal.3d 147, 190 [246 Cal.Rptr. 673, 753 P.2d 629].)

### c. *Sodomy*

Defendant further contends that the prosecutor committed misconduct both by questioning Dr. Raffle regarding whether the defendant spoke to him about sodomizing Rosie Grover during the course of the rape and also by raising the issue of possible sodomy during his closing argument. Defendant argues that he was not charged with sodomy and that there was no evidence of sodomy in the record.

First, defendant did not object either to the prosecutor's questions to Dr. Raffle or to the discussion of sodomy in the prosecutor's closing argument. His objections, therefore, were waived. (*People* v. *Noguera* (1992) 4 Cal.4th 599, 638 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)

Nevertheless, addressing the claim on the merits, we find no misconduct. First, the pathologist testified that "rare spermatozoa" had been found in the

victim's anus. Second, Officer Gall testified that, based upon the presence of a white material on the victim's stomach, there was some basis to believe that the victim had been on her stomach at some point during the assault. While the evidence does not overwhelmingly support the prosecutor's theory that sodomy occurred, there was a sufficient evidentiary basis in the record to justify the prosecutor's question to Dr. Raffle and the prosecutor's statements during closing argument. (See *People* v. *Thomas* (1992) 2 Cal.4th 489, 526 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

Further, we conclude that, even if the prosecutor's fleeting references to sodomy could be deemed misconduct, they were not prejudicial. First, Dr. Raffle testified that defendant denied committing this crime. Second, given the evidence of the rape, the extremely brutal nature of the murder, and the victim's youth, it is not reasonably likely that the brief references in this lengthy trial to the possibility of sodomy were inflammatory. Finally, the jury was explicitly instructed that neither questions nor statements by attorneys are evidence. We find no reasonable likelihood that the jury was misled. (Cf. *People* v. *Thomas, supra,* 2 Cal.4th at p. 526.)

### d. *Cumulative Error*

Defendant argues cumulative error resulting from the prosecutor's alleged misconduct. We find no cumulative error supporting reversal. (See *People* v. *Hawthorne, supra,* 4 Cal.4th at p. 79.)

### 3. *Attack on Dr. Raffle*

 Defendant next contends that the prosecutor committed misconduct by personally attacking Dr. Raffle by referring to him numerous times as a "liar" during cross-examination and summation. Defendant again failed to object to many of the questions and statements of which he now complains, thus waiving his objections. We further conclude that, after reviewing Dr. Raffle's testimony and the testimony of other experts during trial, it is apparent that sufficient discrepancies existed for the prosecutor to question Dr. Raffle's veracity. Under these circumstances, it was not prejudicial misconduct for the prosecutor to refer to Dr. Raffle during closing argument as a "liar," since this was one inference that could be drawn from the testimony admitted during trial. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 948 [4 Cal.Rptr.2d 765, 824 P.2d 571] ["prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence"].)

### H. *Other Purported Evidentiary Errors*

### 1. *"Blood-spatter" Testimony*

 Defendant argues that testimony on the subject of "blood-spatter" by Linton von Beroldingen (1) failed to meet the *Kelly/Frye* test (*People* v.

*Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [34 A.L.R. 145]), and (2) was presented by an unqualified expert. Defendant's contentions lack merit.

First, with respect to the *Kelly/Frye* issue, this objection was not raised in the trial court and defendant failed to preserve this issue for appeal.(*People* v. *Kaurish* (1990) 52 Cal.3d 648, 688 [276 Cal.Rptr. 788, 802 P.2d 278].)

Second, overlooking the procedural obstacle, the objection is without merit.[32] The testimony at issue here raises none of the concerns addressed by *Kelly/Frye*. "The methods employed are *not* new to [science] or the law, and they carry no misleading aura of scientific infallibility." (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1157 [265 Cal.Rptr. 111, 783 P.2d 698] [psychological profile testimony], italics in the original.) In fact, the admissibility of "blood-spatter" or "blood dynamics" testimony in this state predates our *Kelly* decision. (*People* v. *Carter* (1957) 48 Cal.2d 737, 750-751 [312 P.2d 665].) Moreover, neither the experiments conducted in connection with such analysis nor the principles underlying it produce an "aura of scientific infallibility." Rather, it is a matter of common knowledge, readily understood by the jury, that blood will be expelled from the human body if it is hit with sufficient force and that inferences can be drawn from the manner in which the expelled blood lands upon other objects. The *Kelly/Frye* rule is inapplicable.[33]

To the extent that defendant now renews his objection to the qualifications of Linton von Beroldingen, this objection is also without merit. ▉ "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) The trial court's determination that a witness is qualified as an expert will not be reversed on appeal absent a clear abuse of discretion. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].)

▉ No abuse of discretion is shown on this record. The witness had: (1) attended lectures and training seminars on the subject of blood dynamics

---

[32]For a review of decisions addressing the admissibility of "blood-spatter" evidence, see Annotation, Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as to "Blood Splatter" Interpretation (1993) 9 A.L.R.5th 369. This annotation demonstrates that the majority of courts that have considered the issue have determined that this type of testimony is admissible on varying grounds.

[33]For this and other reasons, we do not address the effect, if any, on our *Kelly* decision of the high court's recent decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. __ [125 L.Ed.2d 469, 113 S.Ct. 2786].)

in both California and Oregon; (2) read relevant literature; (3) conducted relevant experiments;[34] and (4) visited crime scenes where "blood-spatter" tests were conducted. (*People* v. *Carter, supra,* 48 Cal.2d at p. 750; but see *People* v. *Hogan, supra,* 31 Cal.3d at pp. 851-852.) The trial court reasonably concluded that the witness was qualified to assist the jury in its inquiry.

Finally, no prejudice possibly could have resulted from the "blood-spatter" testimony. The testimony in question was brief and not inflammatory in light of the ample evidence of the brutality of the murder.

### 2. *Dr. Coleman's Testimony*

Defendant next contends that the trial court erred by permitting Dr. Lee Coleman (Coleman), a psychiatrist, to testify as a rebuttal witness for the prosecution during the guilt phase of the trial. Coleman testified regarding the doubtful value of certain psychiatric testimony offered by the defense experts, especially that offered by Dr. Raffle regarding defendant's state of mind at the time of the crimes.

Defendant concedes that in a recent case we rejected similar objections to such testimony by the same Coleman. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 728-731 [13 Cal.Rptr.2d 1, 838 P.2d 729].) Defendant's attempt to factually distinguish this adverse authority is without merit. Considerations similar to those expressed in our prior opinion lead us to conclude that the admission of Coleman's testimony was neither improper nor prejudicial. (*Ibid.*)

Defendant also objects to Coleman's testimony on the ground that he was not qualified to give expert testimony on the subject of "the unreliability of psychiatric testimony" and that this subject is not a proper subject of expert testimony. These contentions lack merit. Based upon the facts elicited in voir dire of the witness, the trial court did not abuse its discretion in permitting Coleman's opinion testimony.

---

[34]Defendant's challenges to the foundation of the witness's testimony that are premised upon the fact that his past experiments were not conducted under substantially similar circumstances as the crime are rejected for the same reasons given in *People* v. *Carter, supra,* 48 Cal.2d at page 750.

## I. *Jury Instructions*

### 1. *Unconsciousness*

#### a. *Failure to Define*

 The jury was instructed on the presumption of consciousness based upon the language of CALJIC No. 4.31.[35] Defendant argues that the instruction was defective because it did not include a definition of "unconscious." The defendant further contends that the trial court had a sua sponte duty to define this term. We reject defendant's claims.

Assuming without deciding that "unconscious" has a sufficiently legal, technical meaning to require a sua sponte instruction (see *People* v. *Howard* (1988) 44 Cal.3d 375, 408 [243 Cal.Rptr. 842, 749 P.2d 279]), there is no question in this case that the jury instructions as given adequately conveyed to the jurors that the law contemplates that an unconscious person can be capable of movement. CALJIC No. 4.31 itself advised the jury that a reasonable doubt that the defendant was conscious required a finding that he was unconscious even if he "acted as if he were conscious. . . ." CALJIC No. 8.47, as given by the court, told the jurors that "[i]f you find that the Defendant killed while unconscious as a result of voluntary intoxication and therefore did not form a specific intent to kill or did not harbor malice aforethought, his killing is involuntary manslaughter." Both of these instructions unmistakably convey to a reasonable juror the information that defendant claims was missing from the instructions.

#### b. *Constitutionality*

Defendant further contends that CALJIC No. 4.31 unconstitutionally shifted the burden to defendant to prove his unconsciousness in violation of his due process rights under the federal and state Constitutions. We have previously rejected this claim. (*People* v. *Babbitt* (1988) 45 Cal.3d 660, 693-694 [248 Cal.Rptr. 69, 755 P.2d 253].)

Defendant contends that "subsequent decisions" of the United States Supreme Court nevertheless support his claim. The only such decision cited

---

[35]CALJIC No. 4.31, as given by the court, states: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the Defendant acted as if he were conscious, you should find that he was conscious unless from all the evidence you have a reasonable doubt that he was, in fact, conscious at the time of the alleged offense. If the evidence raises a reasonable doubt that he was, in fact, conscious you must find that he was then unconscious."

References to CALJIC are to the 4th edition, published in 1979, unless otherwise noted.

by defendant is *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884]. Nothing in that decision requires that we reconsider our previous rejection of the argument defendant advances. Moreover, the standard of review for instructional error set forth in that decision subsequently was repudiated by the high court. (*Estelle* v. *McGuire* (1991) 502 U.S. __ [116 L.Ed.2d 385, 399, fn. 4, 112 S.Ct. 475].)

### 2. *Intoxication*

■ Defendant next complains that, by failing to include the introductory paragraph of CALJIC No. 4.21, the jury was deprived of the necessary guidance to conclude that evidence of intoxication could negate the intent elements of both the murder and special circumstance allegations.[36] According to defendant this harm was compounded by instructing the jury, pursuant to CALJIC No. 4.20, that intoxication was not a defense to the charge of rape. Defendant argues that in light of the instructions given, the jury was free to conclude that voluntary intoxication could not negate the intent associated with the felony-murder charge premised upon rape or the special circumstance allegation premised upon rape.

Viewed as a whole, there was no reasonable likelihood that the jury was confused or misled regarding the relationship of defendant's intoxication evidence to his intent to commit these crimes. The trial court instructed the jury that first and second degree murder, attempted rape, and findings of special circumstances required certain mental states that it later specified. The jury was advised that the evidence of a mental disorder was relevant to the existence of each of these offenses. The trial court specifically instructed the jury: "If the evidence shows that the Defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if Defendant had the specific intent or mental state required for each crime charged. The specific intent and/or mental state is defined in the definition of each crime you may consider." The jury also was told that intoxication was not a defense to the "offense charged in Count II, namely, rape . . . ." When the instructions are viewed as a whole, the jury was instructed that *one* charge was excluded from the scope of the instructions on voluntary intoxication; all other offenses remained within their scope. We find that there is no reasonable likelihood that the jury would have understood the instructions to foreclose them from considering the evidence of defendant's voluntary intoxication in connection with the rape felony-murder charge or special circumstances allegation.

---

[36]The omitted language of which defendant now complains is as follows: "in the crime of _____ of which the defendant is accused [in Count(s) _____ of the information], a necessary element is the existence in the mind of the defendant of the [specific intent to _____] [mental state(s) of _____]." (CALJIC No. 4.21, brackets in the original.)

Defendant's reliance upon *People* v. *Ramirez* (1980) 50 Cal.3d 1158, 1179-1180 [270 Cal.Rptr. 286, 791 P.2d 965], to support his further contention that the trial court had a sua sponte duty to clarify the instructions relating to intoxication is unavailing. The trial court has no duty to instruct sua sponte on voluntary intoxication. (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

### 3. *Consciousness of Guilt*

 Defendant next contends that the trial court erred by giving two instructions that permitted the jury to infer consciousness of guilt from (1) defendant's deliberately misleading statements (see CALJIC No. 2.03), and (2) defendant's refusal to provide a court-ordered handwriting exemplar (see CALJIC No. 2.06).[37] He argues that the permissive inferences defined in these instructions violate the due process clause of the Fourteenth Amendment. (*Francis* v. *Franklin* (1985) 471 U.S. 307, 314-315 [85 L.Ed.2d 344, 353-354, 105 S.Ct. 1965].) His basic premise is that the instructions implied that, if he lied about the crimes or failed to provide the handwriting exemplar, it could be inferred that he acted with the intent to kill.

Defendant cannot distinguish his contentions from the ones rejected by this court in *People* v. *Ashmus* (1991) 54 Cal.3d 932, 976-978 [2 Cal.Rptr.2d 112, 820 P.2d 214]. In that case we rejected a substantially similar challenge to the same instruction regarding a defendant's deliberately misleading statements. In so doing, we stated: "That defendant had effectively chosen to contest only intent to kill is of no consequence here. A reasonable juror simply could not have taken the words of the instruction to mean that lies by defendant supported an inference of intent to kill on his part. [Citation.]" (*Id.* at p. 978.) We conclude that this reasoning is equally applicable to the permissive inference arising from defendant's refusal to provide the handwriting exemplar. Therefore, we reject defendant's claims relating to both challenged instructions.

---

[37]The challenged instructions read:

"If you find that before this trial the Defendant made willfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

"If you find that the defendant refused a lawful order to give a handwriting sample, such a refusal may be considered by you as a circumstance tending to show a consciousness of guilt as to any issue to which the sample might have been relevant. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration."

## III. PENALTY PHASE EVIDENCE

### A. *Evidence in Aggravation*

Relying on the circumstances of the murder, the prosecutor presented no additional evidence in aggravation during the penalty phase.

### B. *Evidence in Mitigation*

The defense presented the testimony of 23 witnesses—relatives, friends, scoutmasters, a teacher and a mental health counselor, who all testified about the circumstances of defendant's life and his character. Without recounting all of the details of each witness's testimony, the defense presented the following story:

Defendant was the eldest child of Diane and Paul Dean Clark and the brother of Robert and Annette. Although some testimony indicated that defendant's father drank and was abusive, defendant's family life was relatively stable until his parents' separation and his father's subsequent death. While his parents were together, defendant was active in the Boy Scouts and his parents served as scoutmasters. Several witnesses remembered defendant as an "excellent" or "good" scout, who interacted well with his peers.

Numerous witnesses recounted how defendant's family situation deteriorated dramatically after his parents' separation, which occurred when defendant was about 10 years old. Defendant's mother worked menial jobs, often at night. The children were generally left unsupervised. Defendant's mother developed a drinking problem. After her shift, she would not go home to the children, but instead would stop to have a few drinks at the local tavern. Defendant's mother failed to provide a sanitary home or nutritious food for the children. Extensive testimony described the filthy conditions of the home. Defendant tried to care for his younger sister in his mother's absence and to subdue the aggressive behavior of his brother.

After his father's death, which was followed closely by the deaths of both his paternal and maternal grandfathers, witnesses noticed a change in defendant's behavior. Defendant became chronically depressed and stayed withdrawn in his room for extended periods of time.

About this time, defendant and his brother began to drink and use drugs. Their house became the neighborhood "party house" and was akin to a "riot area." There was conflicting testimony regarding whether defendant would

ingest intoxicants when he was caring for his sister. Several of the friends who frequented the defendant's house testified that he was not "the violent type" and frequently broke up physical fights.

During this period of time, defendant and his siblings would occasionally visit a ranch owned by his maternal grandmother. His grandmother and other relatives remembered defendant as a hard worker who volunteered to do tasks at the ranch.

Defendant and his family received counseling from the fall of 1980 through March of 1983. The counseling was precipitated by a fight between defendant and his brother. The counselor found defendant to be depressed and frustrated in school due to a reading problem. Defendant was cooperative during counseling and seemed to care for his family.

Eventually defendant was removed from his mother's custody and placed in a foster home. He apparently thrived in the structured environment. Defendant had a "beautiful" relationship with the other children in the home. However, he occasionally drank beer and smoked marijuana with his foster mother's son.

While living at the foster home, defendant was enrolled in a special education program, which began to address his significant reading deficiency as well as his emotional problems. Defendant was a responsible student and did well in his classes. He was popular and would defend other children. He continued to have a problem with drug usage during the school day, which his teacher attributed to a need to escape the pain and anger he felt about his mother and brother.

When defendant graduated from high school, he was forced to leave his foster home. He worked at the Aloha Saw and Mower Shop. The owner remembered him as a reliable worker with a good attitude. He lived for a time with Keith Michalek. Both Keith and his father recalled defendant as a good, trustworthy person, who was never "rowdy." While he was living with Keith, he drank beer and smoked marijuana occasionally, but did not use "hard" drugs.

Defendant's mother convinced defendant to quit his job and come live with her in Anderson. His mother later moved to Oregon without him. Prior to his mother's move, defendant tried to commit suicide, apparently as the result of a failed romantic relationship.

While he was living in Anderson, defendant began to care for Smith. Robert Clark testified that Smith was a heroin addict. About three months before the murder, defendant injected methamphetamine for the first time.

Numerous witnesses testified that they could not believe that defendant had committed the crimes for which he was convicted.

Finally, the jury heard that while he was awaiting his trial, defendant continued his attempt to overcome his reading deficiency by working with a counselor from the Mendocino County Adult Literacy Program.

### C. *Evidence in Rebuttal*

To rebut the testimony of defendant's mother that defendant wore a cross around his neck "off and on" throughout his childhood, the prosecutor presented the testimony of Ukiah Police Officers Charles Durfee and Edward Gall. Durfee essentially could not remember whether defendant had been wearing a cross when he contacted him just after the crime. Gall testified that defendant was not wearing a cross around his neck at the time of the arrest.

## IV. PENALTY PHASE ISSUES

### A. *Witt Contentions*

The trial court excused for cause prospective jurors Louis Rinaldi and Anna Kytle. Defendant challenges these rulings. After reviewing the voir dire of these prospective witnesses, we find no error.

In deciding whether to excuse a potential juror for cause, the trial court must determine "whether the juror's views [on the death penalty] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844], fn. omitted, quoting *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589-590, 100 S.Ct. 2521]; see also *Morgan* v. *Illinois* (1992) 504 U.S. __ [119 L.Ed.2d 492, 502, 112 S.Ct. 2222]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250] [adopting same standard for state constitutional right].) On appeal, we determine whether the trial court's decision is supported by substantial evidence. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 962; *People* v. *Hardy, supra,* 2 Cal.4th at p. 129.) "[I]f the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865]; accord, *People* v. *Payton* (1992) 3 Cal.4th 1050, 1063 [13 Cal.Rptr.2d 526, 839 P.2d 1035].)

The record supports the trial court's excusal of these jurors for cause. Prospective juror Kytle repeatedly responded to questions during voir

dire with answers such as the following: "That just means that I don't think I could vote for the death penalty. I just don't believe I could." She also stated: "Well, I don't feel that I have the right to sentence anybody to death." Prospective juror Rinaldi initially agreed with the trial court's assessment of his views that he would "automatically" vote for life without the possibility of parole. Under strenuous questioning from defense counsel, Rinaldi stated that, if the aggravating circumstances were "so dire" or "so heinous," there was a "possibility" that he might vote for the death penalty. Rinaldi stated throughout voir dire, however, that it would be "very difficult" for him to vote for the death penalty. He stated again later "[t]hat if there is any alternative to death for the individual I would take that alternative." These responses and others like them amply supported the trial court's decisions. (*People* v. *Payton*, *supra*, 3 Cal.4th at p. 1063; *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 809.)

### B. *Alleged Prosecutorial Misconduct*

Defendant argues that he was denied a reliable determination of his penalty as a result of numerous instances of prosecutorial misconduct during the penalty phase of his trial. We review each allegation of misconduct in turn.

### 1. *Prior Criminal Activity*

▮ Defendant claims error in the admission of testimony elicited on cross-examination and referred to by the prosecution during summation relating to defendant's prior criminal activity, including a juvenile burglary, theft from his mother, selling of drugs, and suspensions from school. He objects to the admission of such evidence on the grounds that it violated section 190.3's notice requirement, did not fall within the scope of any aggravating factor under that section, and was not supported by the evidence.

Defendant did not object at trial to several of the instances of misconduct of which he now complains. Thus, defendant has waived his objections to the following purported misconduct: (1) cross-examination of Petra Lovelis on the subject of defendant's juvenile burglary; (2) cross-examination of Wayne Daniels regarding defendant's periodic suspensions from school; (3) prosecutorial argument regarding the possibility that defendant participated in more than one of his brother's burglaries; and (4) prosecutorial argument regarding defendant's intent to commit automobile burglaries on the night of the crime. (E.g., *People* v. *Noguera*, *supra*, 4 Cal.4th at p. 638.) Nevertheless, we also address defendant's claims on the merits.

In presenting his case in mitigation, defendant presented numerous witnesses who testified to his good character and reputation in his youth. These witnesses testified that defendant was a hard worker who tried to impress his elders; trustworthy; protective of his siblings and classmates; never aggressive or physically violent; responsible; an excellent Boy Scout and a good student; and generally, a good, nice person. Many witnesses expressed incredulity that the defendant could have committed the crimes for which he had been convicted. Overall, the defense case presented the picture of a trustworthy, peaceable person, who had risen above his deprived childhood.

The evidence about which defendant now complains was proper rebuttal to the defense case in mitigation. (See *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1072 [5 Cal.Rptr.2d 230, 824 P.2d 1277] [hereafter *Mitcham*].) In *Mitcham*, the defense case "painted an overall picture of an honest, intelligent, well-behaved, and sociable person incompatible with a violent or antisocial character." (*Ibid.*) We found that under such circumstances, the admission of defendant's juvenile misconduct and his entire juvenile court file was proper rebuttal evidence. (*Ibid.*) As in *Mitcham*, the prosecutor's inquiry into instances of burglary, theft, drug selling and school suspension was warranted to rebut the picture painted of the defendant by the evidence presented in mitigation.

Because the challenged evidence was proper rebuttal, defendant's claims must fail. As we stated in *Mitcham*, *supra*, 1 Cal.4th at pages 1072-1073: "Rebuttal evidence is not subject to the notice requirement of section 190.3 and need not relate to any specific aggravating factor under section 190.3. [Citation.] That the [evidence in question was] not necessarily evidence of criminal activity involving force or violence under factor (b), or prior felony convictions under factor (c) of section 190.3, is therefore irrelevant. [Citation.] Furthermore, that the juvenile misconduct did not result in criminal convictions is similarly irrelevant. The rebuttal evidence was not necessarily offered to establish past criminal activity on defendant's part but rather to rebut defendant's claim of good character. [Citation.]"

Finally, to the extent that defendant objects to numerous statements relating to his prior misconduct made by the prosecutor on the ground that these statements were not supported by the record, we reject his claims. Defendant waived his claims by failing to object at trial to any of these statements. (E.g., *People* v. *Noguera*, *supra*, 4 Cal.4th at p. 638.) Further, our review of the record indicates that each of these statements had a sufficient evidentiary basis. (E.g., *People* v. *Thomas*, *supra*, 2 Cal.4th at p. 526.) It was for the jury to determine whether the inferences suggested by the prosecutor were logical. (*People* v. *Lewis*, *supra*, 50 Cal.3d at p. 283.)

### 2. *Knife Fight*

 Defendant next contends that the prosecutor impermissibly argued that evidence relating to a fight between defendant and his younger brother, which involved the use of a knife by one or both siblings, could be considered as a factor in aggravation.[38] Defendant's claim lacks merit.

First, defendant waived this claim by failing to object at trial. (E.g., *People* v. *Noguera, supra,* 4 Cal.4th at p. 638.)

Second, the prosecutor's statement was proper. The inferences that could be drawn from the testimony regarding the knife fight could properly be considered under section 190.3, factor (k), since it was relevant to dispute defendant's mitigating evidence that he was a nonviolent, nonaggressive person, whose role in fights was generally to stop them.[39]

Finally, despite defendant's contentions, there was an adequate evidentiary basis to support the prosecutor's argument that defendant stabbed his brother. Although he claimed during trial that it was not true, the brother admitted having previously stated that defendant stabbed him.

### 3. *Sodomy*

 Defendant contends that the prosecutor committed misconduct by arguing sodomy as a factor in aggravation.[40] Defendant did not object to the prosecutor's statement at trial and this issue is waived. (E.g., *People* v. *Noguera, supra,* 4 Cal.4th at p. 638.) Nevertheless, considering defendant's claim on the merits, we find that the possibility of sodomy was a circumstance of the charged crimes that could be argued in aggravation and no

---

[38]The relevant portion of the prosecutor's argument follows: "Now, you did hear about a knife fight and some of the testimony was nonhearsay. However, none of the evidence on the knife fight was allowed in for this purpose and so that evidence may be considered down when you get to the K factor, sympathy factor, and we get talking about the good character or bad character of the defendant. But it's not been allowed in under factor B."

[39]Because the prosecutor agreed not to argue that evidence of the knife fight constituted "criminal activity" under section 190.3, factor (b), we do not consider whether the evidence could have been admitted on that ground also. (See *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 587-588 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 290-291 [247 Cal.Rptr. 1, 753 P.2d 1052], cert. den. (1989) 488 U.S. 1034 [102 L.Ed.2d 980, 109 S.Ct. 848].)

[40]The prosecutor argued: "We've never established one way or the other whether he sodomized her. You can look at the crime scene photos, People's 20, 21. You will see the white material on her stomach that Officer Gall talked about. There's some indication, in other words, that she was on her stomach at some point. I won't go back over all of that evidence. The point simply is that there was a real meanness about the way that the sexual acts were accomplished."

additional notice was required to be given. (§ 190.3 [4th par.].) Finally, although the evidence to support the inference of sodomy was not overwhelming, it was sufficient to permit the prosecutor to argue this inference to the jury as a circumstance of the crimes of rape and murder. (*People* v. *Thomas, supra,* 2 Cal.4th at p. 526.)

### 4. *Future Dangerousness*

Defendant next contends that the prosecutor committed misconduct by introducing evidence of and commenting upon the possibility of defendant's future dangerousness. Defendant's argument lacks merit.

First, defendant's claims are waived due to his failure to object to either the prosecutor's line of questioning or his comments during argument. (*People* v. *Noguera, supra,* 4 Cal.4th at p. 638; *People* v. *Mattson, supra,* 50 Cal.3d at p. 877.)

Considering defendant's claims on the merits, we conclude that they hinge on a dubious factual premise. The prosecutor neither asked questions about nor argued that defendant would be dangerous in the future if sentenced to life without the possibility of parole. Rather, the prosecutor asked witnesses Wayne Daniels, defendant's special education teacher, and Kathryn Cote, a county mental health worker who treated defendant's family in his youth, whether appellant displayed signs of psychopathy. Similarly, during closing argument, the prosecutor twice referred to evidence that defendant fit the diagnosis of a psychopath. Contrary to defendant's unsupported assertions, the word "psychopath" does not necessarily connote "future dangerousness."

Moreover, the prosecutor's cross-examination of the two witnesses was within the scope of permissible rebuttal. Both witnesses testified that defendant was a person who cared for others. A person suffering from psychopathy or antisocial personality disorder, both of which were diagnoses that defense experts had applied to defendant at trial, generally does not exhibit this characteristic. The prosecution, therefore, was permitted to test the witnesses' contrary evaluations on cross-examination. Furthermore, Cote had previously diagnosed defendant as exhibiting an "undersocialized, aggressive type" of conduct disorder, a diagnosis that can be a precursor of, and shares many of the same elements as, psychopathy or antisocial personality disorder. The prosecutor was entitled to place this contradiction before the jury. By so doing, the prosecutor did not violate any prohibitions on introducing expert testimony on the subject of future dangerousness in his case in aggravation. (Cf. *People* v. *Mattson, supra,* 50 Cal.3d at p. 878.)

With respect to the prosecutor's argument, we find that the brief references to the word "psychopath" were part of a fair comment on the evidence

received at trial, including the diagnoses of defendant as a person exhibiting characteristics of antisocial personality disorder or psychopathy and the import of those diagnoses. Furthermore, even if we accept defendant's argument that the prosecutor's statements constituted commentary on his future dangerousness, we have repeatedly held that such comments do not amount to misconduct. (E.g., *People* v. *Thomas, supra,* 2 Cal.4th at p. 537; *People* v. *Pinholster, supra,* 1 Cal.4th at pp. 963-964; *People* v. *Daniels* (1991) 52 Cal.3d 815, 890 [277 Cal.Rptr. 122, 802 P.2d 906].)

### 5. *Davenport Error*

▮ Defendant argues that two passages in the prosecutor's argument improperly invited the jury to consider the absence of mitigating evidence in aggravation. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861] (hereafter *Davenport*).) We disagree.

Defendant did not object at trial to any of the prosecutor's statements that he now challenges. Although we have reviewed such challenges in the absence of an objection when the trial occurred before *Davenport* was decided, this trial does not come within this exception. Because a timely admonition would have cured any harm, defendant has waived his objection. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 200 [276 Cal.Rptr. 679, 802 P.2d 169].)

Notwithstanding this procedural barrier, we discern no misconduct in the challenged passages of the prosecutor's argument. In the first passage of which defendant complains, the prosecutor reviewed the factors set forth in section 190.3 in connection with the mitigating evidence presented by the defendant. Commenting upon several factors, the prosecutor stated that "defendant cannot claim mitigation from the potentially mitigating factor." Although the prosecutor noted the absence of certain mitigating factors, he did not expressly or implicitly argue that the absence of these factors could be considered in aggravation. These statements were well within the range of proper prosecutorial argument. (*People* v. *Bell, supra,* 49 Cal.3d 502, 551-552; *People* v. *Dyer* (1988) 45 Cal.3d 26, 83 [246 Cal.Rptr. 209, 753 P.2d 1].)

In the second passage of challenged comments, the prosecutor, using the factor of moral justification as an example, briefly argued: "I think that even where a mitigating factor can't be claimed you can see something from the intent of the law, something about the intent of the law by the fact that it lists those as mitigating." Again, the prosecutor never suggested that the inapplicability of this factor or any of the other factors weighed in favor of death.

Rather, the prosecutor argued that the absence of this factor indicated that the defendant was less deserving of leniency, rather than more deserving of death. Argument of this type does not contravene the rule set forth in *Davenport.* (Cf. *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113].)

Defendant also argues that his constitutional rights were infringed by the failure of the trial court to instruct the jury on the meaning of the terms "aggravating" and "mitigating." We have previously rejected this claim and defendant provides no persuasive reason for us to reconsider our prior rulings. (E.g., *People* v. *Malone* (1988) 47 Cal.3d 1, 55 [252 Cal.Rptr. 525, 762 P.2d 1249].)

### 6. *Lack of Remorse*

 Defendant next contends that the prosecutor improperly argued defendant's lack of remorse as a factor in aggravation and that the prosecutor relied upon inadmissible hearsay in support of his argument.

Defendant again did not object at trial to any of the challenged prosecutorial remarks. The issue therefore is waived. (*People* v. *Hardy, supra,* 2 Cal.4th at p. 210.)

Considering the issue on the merits, we find no error. The prosecutor's references to defendant's callousness after the crime, as demonstrated by his drinking the wine cooler and devising a plan to report the crime in order to cover up his involvement, were permissible comment upon aspects of the capital crime itself under section 190.3, factor (a). (*People* v. *Webster* (1991) 54 Cal.3d 411, 452 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1232 [275 Cal.Rptr. 729, 800 P.2d 1159].)

Defendant also complains of the prosecutor's comment that the first part of the Taped Statement consisted of remarks by defendant about himself and his troubles with no consideration shown for the victim. We have held that such comments on defendant's lack of remorse are proper. (*People* v. *Wright* (1990) 52 Cal.3d 367, 436 [276 Cal.Rptr. 731, 802 P.2d 221] [prosecutor permissibly argued that defendant's tape-recorded confession showed no remorse].)

Finally, defendant renews his argument that the reference to the Mendocino County jail report used to impeach the testimony of Dr. Raffle during the guilt phase was improper. Defendant claims that prejudice resulted in the penalty phase from the introduction of these statements and cites in support

of his contention the jury's request during deliberations for "a reread [sic] of that portion of the testimony at the end of day on 5-8-87 pertaining to jail report (Mendo [sic] County Jail) on 10-17-85 and remorseful statement and attempted suicide of Clark, (Raffle testimony) . . . ."

We reject defendant's claim of prejudicial error for several reasons. First, defendant did not object at trial to the use of the report. Second, the prosecutor did not refer to either the report or to Dr. Raffle's testimony regarding the report during his penalty phase arguments.

Furthermore, even if we assume that reading from the report was error, we do not discern prejudicial impact on the penalty phase verdict. The jury was instructed repeatedly throughout the trial that defendant's statements to experts or considered by experts were not to be considered for their truth. Defendant did not ask for a reiteration of this instruction when the testimony in question was read to the jury. The testimony relating to the report was not emphasized by the prosecutor during the penalty phase and was a minuscule part of the lengthy and effective cross-examination of Dr. Raffle. There was other substantial evidence in the record from which the jury could have inferred that defendant lacked remorse for his crimes. Furthermore, the jury continued to deliberate for a substantial period of time after the requested testimony was read. Under such circumstances, we are satisfied beyond a reasonable doubt that the prosecutor's use of a phrase from this report to impeach Dr. Raffle did not affect the penalty phase verdict. (See *People* v. *Bell, supra*, 49 Cal.3d at p. 534.)

### 7. *Religion*

■ Defendant asserts error in the prosecutor's introduction of rebuttal testimony on the subject of whether defendant was wearing a cross after the crime or at the time of his arrest. Defendant contends that the prosecutor's conduct introduced lack of religion as a factor in aggravation and violated his First Amendment rights. Defendant's contentions lack merit.

Defendant wore a cross every day of his trial. On direct examination during the penalty phase, his mother testified that appellant wore a cross off and on throughout his childhood. Defendant thus introduced the subject of religion at the penalty phase and the defense testimony gave the impression that defendant was a religious person. The prosecutor was entitled to present evidence to rebut the mother's testimony and this inference. (See *People* v. *Mason* (1991) 52 Cal.3d 909, 961 [277 Cal.Rptr. 166, 802 P.2d 950].) The fact that this testimony related to the exercise of the defendant's First Amendment rights does not affect the admissibility of the testimony.

(Cf. *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 580-582 [286 Cal.Rptr. 628, 817 P.2d 893].)

### 8. *Characteristics of the Victim*

Defendant next contends that the prosecutor impermissibly referred to the victim's age, vulnerability, innocence, photograph and absence from trial during his argument. Defendant argues that the prosecutor's statements violated his rights for three reasons: (1) "victim impact information" is not an aggravating factor under section 190.3; (2) even if such information was permissible in aggravation, defendant did not receive proper notice that the prosecutor would rely on such evidence; and (3) the argument violated defendant's right to a reliable and individualized sentencing. Defendant again did not object at trial to the challenged arguments and his objections are waived.(E.g., *People* v. *Noguera, supra,* 4 Cal.4th at p. 638.) In any event, we find defendant's arguments to be without merit.

First, the prosecutor's references to the victim's age, vulnerability and innocence related directly to the circumstances of the crime. The prosecutor's invitation to the jury to look at the victim's photograph and the contents of her suitcases merely drew attention to evidence that underscored the youth of the victim. The age, vulnerability and innocence of the victim all served to support the inference that the victim did not consent to intercourse with the defendant and in all likelihood was in no position to resist the brutal onslaught by the defendant that caused her death. The prosecutor's observations regarding the circumstances of the crime were appropriate. (E.g., *People* v. *Wright, supra,* 52 Cal.3d at pp. 435-436; *People* v. *Carrera* (1989) 49 Cal.3d 291, 336-337 [261 Cal.Rptr. 348, 777 P.2d 121]; see also *People* v. *Cox, supra,* 53 Cal.3d at p. 688 [photograph of victim].)

Furthermore, there is no requirement that the prosecutor give notice of evidence in aggravation that is related to the circumstances of the capital crime. (§ 190.3, 4th par.) Moreover, the prosecutor's argument did not constitute evidence; therefore, the notice requirement was inapplicable.

Second, the prosecutor's comments relating to the victim's absence from trial were also appropriate. The import of the prosecutor's statements were to remind the jury that, while it may be natural to sympathize with defendant, because the jury sees him every day, the victim (and her inability to attend

the trial) should be remembered when the jury is making its decision.[41] It is permissible for the prosecutor to urge that the jurors remember the victim and the life that she might have led. (*People* v. *Cox, supra,* 53 Cal.3d at p. 687; *People* v. *Williams, supra,* 44 Cal.3d at p. 967.) Moreover, we have held that the use of the very quotation employed by the prosecutor is permissible. (*People* v. *Rowland, supra,* 4 Cal.4th at pp. 277-278, fn. 17.)

Finally, unlike defendant, we see nothing in the prosecutor's argument that violated defendant's due process and Eighth Amendment rights to a reliable and individualized sentencing. Although defendant relies upon *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597] in support of his argument, *Payne* recognizes that the defendant's rights are not infringed by evidence or argument showing that the victim was a unique and valuable human being. (*Id.* at pp. __-__ [115 L.Ed.2d at pp. 735-736].)

### 9. *Caldwell Error*

 Defendant next contends that a portion of the prosecutor's rebuttal argument improperly suggested, in violation of the rules set out in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] and *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669], that the responsibility for the penalty determination rests with the "law," rather than the individual jurors.

The challenged portion of the prosecutor's argument stated:

"There was a statement that you will have to live with your verdict for the rest of your life. Mr. Brown did not say this, but that could be interpreted as

---

[41]The challenged portion of the prosecutor's argument begins with the prosecutor reading from a book:

" 'When one person kills another there's immediate revulsion at the nature of the crime. But in a time so short as to seem indecent to the members of the personal [*sic*] family the dead person ceases to exist as an identifiable figure. To those individuals in the community of good will and empathy, warmth and compassion, only one of the key actors in the drama remains with whom to commiserate and that is always the criminal. The dead person ceases to be a part of every day reality, ceases to exist. She is only a figure in a historic event. We inevitably turn away from the past toward the ongoing reality, and the ongoing reality is the criminal, trapped, anxious now helpless, isolated, often badgered and bewildered. He usurps the compassion that is justly his victim's due. He will steal his victim's moral constituency along with her life.' "

As noted in *People* v. *Rowland* (1992) 4 Cal.4th 238, 277-278, footnote 17 [14 Cal.Rptr.2d 377, 841 P.2d 897], this quotation is from "The Killing of Bonnie Garland," by Dr. Willard Gatland.

The prosecutor continued:

"The point of reading that is not any criticize—not any criticism of our system. The point arises because the victim is gone and the Defendant is here."

a suggestion that do not vote for the penalty that the prosecutor suggests because you are going to have that on your conscience the rest of your life. Well, I'd suggest this: If that were true, that would also be true of my job. I, as a prosecutor, after all, am seeking the death penalty after our own consideration of this case, that is what I decided to do. I do not feel that a verdict that is correct under the law, a decision that's correct under these legal guidelines, is one that will rest adversely upon the conscience of a juror, a prosecutor.

"If the crime, if what he did to Rosie Grover is bad enough, is aggravated enough under the factors that the judge gave to you, then it's the law that suggests that you may impose the death penalty. And I suggest that that is consistent with you being moral representatives of the community. And it is not something that becomes the responsibility of the individual prosecutor or the individual juror, rather the responsibility of the law and of the man who did the crime."

 The Attorney General argues that defendant has waived his objection to this portion of the prosecutor's argument by failing to object at trial. We disagree. "We have never required an objection to raise claims of error based upon *Caldwell* v. *Mississippi*[, *supra*, 472 U.S. 320] . . . ." (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1104 [259 Cal.Rptr. 630, 774 P.2d 659].)

 Turning to the merits of defendant's claim, we find no reasonable likelihood that the jurors were misled regarding their responsibility for determining the appropriate penalty. The prosecutor explicitly informed the jury that it *"may* impose" the death penalty. The language used by the prosecutor conveyed to the jury that the appropriateness of the death penalty was within the jury's discretion.

Thus, the prosecutor's argument in this case cannot be analogized to the extreme argument in *People* v. *Milner, supra,* 45 Cal.3d at pages 254-256, in which the prosecutor urged the jury to "hid[e] under the veil of the law." The improper content of the prosecutor's argument in that case is illustrated by the following excerpt: " '[S]ometimes it's argued . . . in order to inflame you, to impose upon you, the responsibility, the ultimate responsibility, in saying each one of you is going to kill my client; you have to vote to kill my client. That's not the issue. You are, as jurors, to apply these factors, that's your duty. . . . All juries facing the same set of facts, would come up with the same decision, and this law, hiding under the veil of that law, will protect you from shouldering the weight of your decision, because if you step outside of that, you are definitely shouldering the responsibility.' The prosecutor again told the jury to consider the factors and 'make *not* the verdict

that you individually feel is just or right.' " (*Id.* at pp. 255-256, italics and omissions in original.)

Instead, the prosecutor's argument in this case is similar to the one we reviewed in *People* v. *Fierro* (1991) 1 Cal.4th 173, 245-248 [3 Cal.Rptr.2d 426, 821 P.2d 1302]. In the course of finding no error in the prosecutor's argument in that case, we wrote: "In admonishing the jurors not to 'feel guilty' or 'personally responsible,' the prosecutor was merely suggesting, albeit inartfully, that the moral blame for the crimes and their consequences rests with defendant, not with the jurors; there was no suggestion that the law simply required the jurors to tally the competing factors in aggravation and mitigation, rather than to individually consider and assign moral weight to the evidence." (*Id.* at p. 247.) The prosecutor's argument in the present case conveyed this same acceptable meaning. We perceive no error.

### 10. *Cumulative Impact of Misconduct*

We have found no instances of prosecutorial misconduct. To the extent that the use of the Mendocino County jail report to cross-examine Dr. Raffle may have been error, we have found no prejudice resulting therefrom. For these reasons, we do not address defendant's arguments premised upon the cumulative, prejudicial impact of the alleged penalty phase errors.

### C. *Allocution*

 Defendant next contends that his constitutional rights of due process and equal protection were violated by the trial court's ruling denying his request to address the jury in allocution during the penalty phase. We reject defendant's claims.

This court repeatedly has held that a capital defendant has no right to address the penalty phase jury in allocution. (*People* v. *Nicolaus, supra,* 54 Cal.3d at p. 583; *People* v. *Keenan* (1988) 46 Cal.3d 478, 511 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Robbins* (1988) 45 Cal.3d 867, 888-890 [248 Cal.Rptr. 172, 755 P.2d 355].) Defendant presents no persuasive reason for this court to reconsider its prior rulings.

The recent decision of the Ninth Circuit in *Boardman* v. *Estelle* (9th Cir. 1992) 957 F.2d 1523 does not persuade us to reach a different result. In that case, the Ninth Circuit held that the failure to permit a *noncapital* defendant who requests to speak in allocution to do so violates federal due process rights. However, in our *Robbins* decision, we found *Ashe* v. *State of N.C.* (4th Cir. 1978) 586 F.2d 334, 336, a similar federal ruling, to be distinguishable.

We wrote: "In the noncapital sentencing context, a defendant does not generally have an opportunity to testify as to what penalty he feels is appropriate. Accordingly, *Ashe* might be correct in saying a defendant may not be denied that opportunity when he requests it. The sentencing phase of a capital trial, on the other hand, specifically provides for such testimony. The defendant is allowed to present evidence as well as take the stand and address the sentencer. Given this, we fail to see the need, much less a constitutional requirement, for a corresponding 'right to address the sentencer without being subject to cross-examination' in capital cases." (*People v. Robbins, supra*, 45 Cal.3d at p. 889.)

Finally, defendant cites no authority for his equal protection argument and we perceive no merit in it.

### D. *Automatic Application for Modification of Penalty*

Defendant asserts that the trial court did not properly discharge its duty in ruling on his automatic motion for modification of the verdict. (§ 190.4, subd. (e).) Defendant contends that: (1) the prosecutor argued improper factors in aggravation; (2) the trial court relied upon these improper factors; and (3) the trial court improperly considered a probation report. We reject each of defendant's claims.

Defendant's claims of prosecutorial misconduct, however, are essentially a rehash of his previously rejected complaints about the prosecutor's argument to the jury. We need not again address the reasons why the prosecutor's references to the knife fight, the possibility the defendant participated in more than one of his brother's burglaries, the callousness of the defendant immediately following the crime and the possibility of sodomy do not rise to the level of misconduct.

Furthermore, defendant's complaints regarding the prosecutor's specification of five aspects of the crime that rendered it particularly aggravated are meritless. The prosecutor listed these aspects as follows: "The first aspect is the innocence and vulnerability of the 15 year old victim. The second aspect is the Defendant's admission that he weighed the advantages and disadvantages of killing before doing the killing. The third is the meanness of the sex crime. The fourth is the brutality of the killing itself. And the fifth is the Defendant's callousness toward the victim and the crime immediately afterward." Each of these aspects of the crime was properly argued and considered by the court pursuant to section 190.3, factor (a).

Defendant also contends that the court improperly considered the circumstances of the crime under factors (b) and (c) of section 190.3. We have

reviewed the record and find no support for defendant's claim. The court properly found the absence of prior force and violence and prior felony convictions rendered factors (b) and (c) mitigating. In the course of this discussion, the court reiterated its belief that the force and violence associated with the crime itself was an aggravating factor under factor (a).

Defendant further contends that the trial court was improperly influenced by the prosecutor's argument relating to the possibility of sodomy. The only mention by the court of this issue is found in its recitation of the testimony of Dr. Boyd Stephens regarding the physical evidence of the crime. The trial court correctly summarized the physical evidence and Dr. Stephens's opinion that the evidence relating to anal intercourse was inconclusive. This brief reference by the court to the issue of sodomy does not indicate that the court's decision was influenced by this possibility; rather, the trial court's comments reveal that it understood the inconclusive nature of the testimony on this issue. Even if this brief reference to the physical evidence could be deemed to show some minuscule amount of improper influence, we find no reasonable possibility that the error affected the trial court's decision. (See *People* v. *Fauber* (1992) 2 Cal.4th 792, 867 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

Defendant next contends that the trial court took an impermissibly narrow view of section 190.3, factor (k), because the court only referred to the fact "that the defendant was a non-violent person" in its discussion of that factor. Contrary to defendant's assertion, the record reveals that the trial court carefully considered all of the evidence presented by both sides. Under these circumstances, we find a previous observation applicable to the case at hand: "Although the trial court did not expressly *mention* the mitigating evidence referred to by defendant, there is no indication . . . that the court ignored or overlooked such evidence." (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 625 [244 Cal.Rptr. 200, 749 P.2d 854], italics in original.)

Finally, defendant contends that the trial court erred by considering the probation report before it ruled on his motion under section 190.4. The record establishes that the court did review the report, but agreed that, during the section 190.4 proceedings, certain portions of the report, including the summary of the offense, the statements of the next of kin, and the case evaluation, would not be considered pursuant to stipulation by counsel.[42]

In considering the report, the court erred. (E.g., *People* v. *Lewis*, *supra*, 50 Cal.3d at p. 287.) ▉ "But even when the trial court has considered

---

[42]Because we find no prejudicial error, we do not address whether the stipulation of counsel was in effect a waiver of defendant's right to exclude the remaining sections of the report from consideration. (See *People* v. *Gonzalez*, *supra*, 51 Cal.3d 1179, 1238.)

such extraneous information in ruling on the application, we assume there has been no improper influence on the court, absent specific evidence to the contrary. [Citations.]" (*People* v. *Fauber, supra,* 2 Cal.4th at p. 866.)

 The record in this case demonstrates that the trial court's review of the probation report resulted in no prejudice to the defendant. Other than to note that the portions of the report that were not excluded by stipulation had been considered, the court made no express reference to the report in its written decision. The decision reflects the court's familiarity with the mandate of section 190.4, subdivision (e) that its determination be based upon the evidence and guided by the aggravating and mitigating circumstances referred to in that section. The court reviewed each of the potential aggravating and mitigating factors and gave detailed reasons based upon the evidence presented during the trial for determining the nature of and weight attributable to each factor. From our review, it is clear that trial court relied upon the evidence submitted at trial to reach its conclusion and placed great weight upon the circumstances of the crime. We find no reason for reversal.

### E. *Proportionality Review*

 Defendant argues that his sentence is unconstitutionally disproportionate both in comparison to those convicted of similar offenses and in relation to his own culpability. We find no merit in defendant's claims.

 As we have previously observed, " '[i]ntercase' proportionality review is not required by the federal Constitution [citation], and we have consistently declined to undertake it [citations]." (*People* v. *Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Defendant provides no reason for us to depart from our prior holdings.

We have held, however, that the imposition of the death sentence is subject to "intracase" review to determine whether the penalty is disproportionate to a defendant's personal culpability. (E.g., *People* v. *Mincey, supra,* 2 Cal.4th at p. 476.) Relying upon *People* v. *Dillon* (1983) 34 Cal.3d 441, 479-482 [194 Cal.Rptr. 390, 668 P.2d 697], defendant claims that his youth, lack of prior adult criminality, and drug-induced state of mind at the time of the crime renders the death sentence disproportionate to his crimes.

Our review of the facts convinces us that the death penalty is not disproportionate to defendant's true culpability. Defendant raped and then, to avoid being reported to the police for his crime, stabbed and bludgeoned to death a defenseless 15-year-old girl. After the attack, he took with him one of the

victim's wine coolers and proceeded to drink it. He formulated a story, which included reporting his "finding" of the victim's body, that he stuck with until after his arrest.

During the trial, the jury was fully apprised of all the factors properly bearing upon whether defendant was eligible for, and deserved, the death penalty, including the defendant's relative youth, lack of adult criminality and state of mind at the time of the crime. "[N]othing in the prior decisions of this court, or of the federal courts, suggests that his punishment is constitutionally disproportionate to 'the offense' or 'the offender.' [Citation.]" (*People* v. *Adcox* (1988) 47 Cal.3d 207, 275 [253 Cal.Rptr. 55, 763 P.2d 906].)

### F. *Miscellaneous Claims*

Conceding that this court has previously rejected these claims, defendant summarily raises 13 issues, apparently to preserve them for future litigation. Defendant has not convinced us that any of these issues require reconsideration. We, therefore, list below our disposition of defendant's contentions followed by dispositive authority.

1. The trial court did not err by failing to delete inapplicable sentencing factors. (E.g., *People* v. *Raley, supra,* 2 Cal.4th at p. 919.)

2. The trial court did not err by failing to instruct the jury regarding which section 190.3 factors are aggravating and which are mitigating. (E.g., *People* v. *Raley, supra,* 2 Cal.4th at p. 919.)

3. The trial court did not err by failing to instruct the jury that it must find beyond a reasonable doubt that death is the appropriate penalty. (E.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 935-936 [269 Cal.Rptr. 269, 790 P.2d 676].)

4. The trial court did not err by failing to instruct the jury that it must find beyond a reasonable doubt that aggravation outweighed mitigation. (E.g., *People* v. *Raley, supra,* 2 Cal.4th at pp. 919-920.)

5. The 1978 death penalty statute is not unconstitutional because it fails to require: (a) written findings; (b) proof beyond a reasonable doubt of the aggravating factors; (c) jury unanimity on aggravating factors; (d) a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt; (e) a finding that death is the appropriate punishment beyond a reasonable doubt; and (f) a procedure to permit meaningful evaluation of the sentencer's discretion. (E.g., *People* v. *Tuilaepa, supra,* 4 Cal.4th at p. 595.)

6. The trial court did not err by failing to instruct the jury that the sentence of life without parole means that the defendant will never be considered for parole. (E.g., *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1277-1278 [270 Cal.Rptr. 451, 792 P.2d 251].)

7. The trial court did not err by failing to instruct the jury to consider affirmatively all sympathetic mitigating factors, mercy and nonstatutory mitigation. (*People* v. *Cox, supra,* 53 Cal.3d at p. 681; *People* v. *Caro, supra,* 46 Cal.3d at p. 1067.)

8. Defendant's due process rights were not violated by the use of the rape charge to: (a) qualify defendant for a first degree murder charge on a felony-murder theory; (b) qualify defendant for death eligibility under section 190.2, subdivision (a)(17); and (c) enhance aggravation in favor of death under section 190.3, factor (a). (E.g., *People* v. *Marshall, supra,* 50 Cal.3d at pp. 945-946.)

9. The trial court did not err by failing to instruct that the "no sympathy" instruction embodied in CALJIC No. 1.00, given at the guilt phase, did not apply at the penalty phase. (E.g., *People* v. *Adcox, supra,* 47 Cal.3d at p. 265.)

10. The trial court's instruction on "extreme" mental disturbance did not violate defendant's right to have the jury consider all mitigating factors. (E.g., *People* v. *Clark* (1992) 3 Cal.4th 41, 163 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

11. The 1978 death penalty statute did not deprive defendant of the benefit of the Determinative Sentencing Act in violation of due process and equal protection. (E.g., *People* v. *Marshall, supra,* 50 Cal.3d at pp. 945-946; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1330 [248 Cal.Rptr. 834, 756 P.2d 221].)

12. The trial court did not err by failing to instruct the jury that lack of mitigation does not constitute aggravation. (Cf. *People* v. *Ashmus, supra,* 54 Cal.3d at pp. 1004-1005.)

13. The 1978 death penalty statute is not unconstitutionally vague by instructing the jury in terms of section 190.3, factor (a) (circumstances of the capital crime) and section 190.3, factor (i) (defendant's age at time of crime), without further clarification. These unadorned factors do not preclude meaningful and guided distinctions between those murders that warrant the death penalty and those that do not. (*People* v. *Tuilaepa, supra,* 4 Cal.4th at pp. 594-595.)

## V. DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I dissent.

Defendant had a right under the Sixth Amendment to the United States Constitution to the assistance of counsel who is not burdened by a conflict of interests. The right was violated. To be sure, the violation appears without bad faith. But it appears nonetheless. Reversal is required.

I

This was a notorious case in Mendocino County. As the Mendocino County Superior Court stated in granting defendant's motion for change of venue:

"On July 19, 1985, the *Ukiah Daily Journal* reported that a young woman's body had been discovered in a creek bed in Ukiah, that she appeared beaten to death, and that defendant had been taken in for questioning.

"Later stories: Identified the victim as Rosie Grover, 15, a lifelong Ukiah resident, and identified the defendant as a 21 year old drifter; reported that the victim was strangled, stabbed in the back with a screwdriver, and bludgeoned beyond recognition with a length of pipe encrusted with concrete; reported that the defendant was in custody with bail set at $250,000, that he had been arraigned on a charge of murder and had pleaded Not Guilty, and that the magistrate had ordered the prosecution and the defense not to discuss the case with the press; and reported that other inmates at the County Jail in Ukiah, including another accused [capital] murderer, had started a collection to aid the victim's family. [It appears that, as a result of threats by other inmates, including capital defendants, defendant was moved for his own protection from the jail's maximum security section first to its protective custody unit, then to an isolation cell, and finally to the State Prison at San Quentin.]

"On July 26, . . . it was reported that close to 300 friends and family mourned at the victim's funeral before she was buried in the cemetery across the street from the high school where she would have been a sophomore in September.

"On August 8, it was reported that the District Attorney had amended the complaint to add a charge of rape and to allege a death penalty murder, and that the defendant had given a confession to the police.

"On August 22, based on defendant's preliminary examination, it was reported that the victim had phoned the California Highway Patrol about 4:30 A.M. the morning she was killed and had requested a short ride home, which was refused. In the same story, it was reported that every bone in the victim's face was broken by up to 19 blows, that she had been stabbed nine times, and that there was physical evidence that she was raped.

"The next day, the *Journal* ran a story about the victim's call to the CHP and the CHP's policy refusing transportation. In a sidebar, the transcript of the phone call was printed . . . .[1]

"Subsequent stories reported claims filed against the CHP and the Ukiah Police Department by the victim's parents.

"The day after the defendant's preliminary examination ended, the *Journal* reported a detective's testimony that the defendant had made a detailed confession, in which he admitted that he had killed the victim to prevent her from falsely accusing him of rape.

"Although the heaviest press coverage was in *The Ukiah Daily Journal*, other papers circulating in the county, including *The Willits News* and . . .

---

[1]"CHP: Highway patrol.

"RG: Yes. I wanted to know if somebody could come get me because I don't have a way home and I just got off the bus.

"CHP: We don't provide transport at all. Where do you have to go?

"RG: I just have to get down the street a little ways and I don't want to walk by myself because I'm really afraid.

"CHP: Are you at the Greyhound bus depot?

"RG: No, because I walked, I walked some ways by Foster Freeze.

"CHP: OK. You should call the police department. I don't know if they provide transport, the highway patrol doesn't, not in the city limits anyway.

"RG: Oh. Well, how am I supposed to get home?

"CHP: Well, why don't you have somebody waiting for you there?

"RG: Well, because she said (garbled) just to call the cab or something. They don't run this late, (garbled) didn't figure we'd be this late.

"CHP: Well, you're going to have to try the police department because we don't transport any units, and most police agencies can't transport anybody in their units. So try the police department.

"RG: The police department? OK. Will I get into trouble for curfew even though it's not my fault?

"CHP: I don't know. It would be your parents that would get in trouble, not you.

"RG: Oh, yeah, OK. Thank you.

"CHP: OK. Good-by."

*The Santa Rosa Press Democrat,* also ran stories. There was also extensive coverage on local radio. Early news and radio stories were about the killing and the defendant's court appearances. Later coverage has emphasized the victim's phone call to the CHP and the CHP's refusal to provide transportation, and has included editorial comment in the local paper and on the radio. A number of letters to the editor have been published in the local paper.

"In November, the Assemblyman for the Second Assembly District, which includes Mendocino County, mailed each voter in the district a letter decrying this case and requesting support for his legislation which would instruct the CHP to offer rides to citizens who call for help believing they are in danger."

## II

The law that applies to the facts disclosed by the record is as follows.

"Under . . . the Sixth Amendment to the United States Constitution as applied to the states through the due process clause of the Fourteenth Amendment . . . , a defendant in a criminal case has a right to the assistance of counsel. [¶] The constitutional guaranty 'entitles the defendant not to some bare assistance but rather to *effective* assistance.' " (*People* v. *Bonin* (1989) 47 Cal.3d 808, 833 [254 Cal.Rptr. 298, 765 P.2d 460], italics in original.) "[T]his right is 'fundamental' [citation] and 'is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." ' " (*Id.* at p. 834.)

"Included in the right to the effective assistance of counsel is 'a correlative right to representation that is free from conflicts of interest.' " (*People* v. *Bonin, supra,* 47 Cal.3d at p. 834.) "Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests." (*Id.* at p. 835.)

"In order to safeguard a criminal defendant's constitutional right to the assistance of conflict-free counsel and thereby keep criminal proceedings untainted by conflicted representation, the United States Supreme Court has laid down certain essentially prophylactic rules in this area.

"When the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter. [Citations.] It is immaterial how the court learns, or is put on notice, of the possible conflict . . . .

"The trial court is obligated not merely to inquire but also to act in response to what its inquiry discovers. . . . In discharging its duty, it must act ' ". . . with a caution increasing in degree as the offenses dealt with increase in gravity." ' " (*People* v. *Bonin, supra*, 47 Cal.3d at pp. 836-837.)

"When in violation of its duty the trial court fails to inquire into the possibility of a conflict of interest or fails to adequately act in response to what its inquiry discovers, it commits error under *Wood* v. *Georgia* [(1981)] 450 U.S. 261. [Citation.]

"To obtain reversal for *Wood* error, the defendant need not demonstrate specific, outcome-determinative prejudice. [Citation.] But he must show that an actual conflict of interest existed and that that conflict adversely affected counsel's performance." (*People* v. *Bonin, supra*, 47 Cal.3d at pp. 837-838.) As to the former, he must establish that "his counsel actively represented conflicting interests . . . ." (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 350 [64 L.Ed.2d 333, 347, 100 S.Ct. 1708].) As to the latter, he must demonstrate that "counsel 'pulled his punches,' i.e., failed to represent defendant as vigorously as he might have had there been no conflict." (*People* v. *Easley* (1988) 46 Cal.3d 712, 725 [250 Cal.Rptr. 855, 759 P.2d 490].)

## III

I now turn to the case at bar. The first question is this: Did the Mendocino County Superior Court commit *Wood* error? The answer is affirmative.

Early on, the superior court came to know of the possibility of a conflict of interest on the part of defense counsel Susan Massini. At arraignment on September 6, 1985, it appointed Massini, who was then the Public Defender of Mendocino County, as defense counsel. Until June 1986, she would personally represent defendant (together with Joseph D. Allen, who was later appointed to assist her) in several important matters, including a suppression motion. In defendant's motion for change of venue, which was filed on October 30, 1985, she stated that the "District Attorney . . . will be running for re-election in the June primary"—and added cryptically that "present indications are that the race for District Attorney will be hotly contested." In granting the motion on December 20, 1985, the superior court noted that "[l]ocal newspaper and radio publicity during the past two weeks has been about" topics including the "probability that one of defendant's two attorneys," namely, Massini, "will run against the District Attorney . . . ." By that date, the possibility of a conflict of interest was manifest: Massini remained defendant's defender; at the same time, she had expressed her desire to become his prosecutor. The superior court was required to make

inquiry into the matter. It failed to do so. On June 3, 1986, Massini was elected District Attorney. Finally, on July 21, the District Attorney's Office was recused. Subsequently, transfer of the case was effected to the Santa Clara County Superior Court.

The second question is this: Is the *Wood* error reversible? Here too, the answer is affirmative.

Defendant has shown an actual conflict of interest burdening counsel. Massini actively represented his interest in avoiding conviction or at least a sentence of death by, inter alia, making and opposing various motions. At the same time, she actively represented her own interest in becoming District Attorney by campaigning for the position. These interests were conflicting. Indeed, it would strain credulity to claim otherwise. If Massini presented a vigorous defense on behalf of defendant, who was unpopular even among other capital defendants, she would run a strong risk of becoming unpopular herself.

Defendant has also shown an adverse effect on counsel's performance.

In the suppression motion mentioned above, Massini sought to exclude certain highly inculpatory evidence, including a sample of blood drawn from defendant without a warrant at the direction of Detectives Fred Kelley and Ed Gall of the Ukiah Police Department. She was unsuccessful.

It is long- and well-settled that the prosecution bears the burden of proving that a warrantless search or seizure is nonetheless reasonable under the Fourth Amendment. (E.g., *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) It is similarly settled that the drawing of blood without a warrant is reasonable only if supported by both probable cause and exigent circumstances. (See, e.g., *Schmerber* v. *California* (1966) 384 U.S. 757, 766-772 [16 L.Ed.2d 908, 917-921, 86 S.Ct. 1826].)

At an evidentiary hearing on the suppression motion, Detective Kelley all but expressly admitted that there was neither probable cause nor exigent circumstances. He testified that defendant's blood was drawn pursuant to a "basic policy for all felonies" for "[r]outine blood typing" and "[d]rug scans."

Inexplicably, even after this testimony Massini did not attack the action of Detectives Kelley and Gall as based solely on the Ukiah Police Department's underlying "policy." On this crucial point, she "pulled her punches." She

failed to bar unarguably inadmissible evidence.[2] The mere failure to attempt to bar "arguably inadmissible evidence" has been found a sufficient default for present purposes. (*Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 349 [64 L.Ed.2d at p. 347].) Her failure, of course, is more grievous. There is no way to reasonably explain her omission other than as a shying away from criticism of an organization with which she would work closely if she were elected district attorney. Perhaps we should be "hesitant to assume that counsel succumbed to the allure of [personal] interest where [her] decisions could also be justified as tactically best for defendant." (2 LaFave & Israel, Criminal Procedure (1984) § 11.9(d), p. 93.) Massini's "decision" is not such. So far as defendant is concerned, her omission promised no benefit and threatened only cost.

It is true that there is no evidence that Massini acted other than in good faith. The presence of bad faith, however, is not required. Similarly, the absence of bad faith is not material.

IV

Because of my conclusion that defendant's Sixth Amendment right to the assistance of conflict-free counsel was violated, I need not proceed further. One additional issue, however, deserves comment.

The question arises whether, in a certain instance, defense counsel provided ineffective assistance under the Sixth Amendment.

In the Santa Clara County Superior Court, Joseph D. Allen and Ronald W. Brown, who were then defendant's attorneys, filed a motion *in limine* to exclude various confessions and admissions. They called Peter Glen Mayland, M.D., a psychiatrist, to testify at the hearing. They believed that his testimony would possibly be helpful on the questions there considered. But they knew that that same testimony would necessarily be detrimental on the issues of guilt and penalty. Nevertheless, they put him on the witness stand

---

[2] The majority attempt to avoid inadmissibility through the theory of "inevitable discovery." It should be observed at the outset that the theory was not raised by either the People or defendant in either the superior court or this court. In my view, "inevitable discovery" may not properly be invoked. In attacking or defending a ruling on a suppression motion on appeal, the parties are not allowed to go beyond the arguments they presented regarding the motion below. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33].) As noted, neither the People nor defendant raised the theory in the superior court. They would not be permitted to raise it in this court. I am not persuaded that we may do what they may not. In any event, "inevitable discovery" simply does not work. What would have been "inevitably discovered" is *not* the blood drawn from defendant without a warrant, but blood different from that sample in various ways by reason of the process of metabolization. The majority effectively concede the point.

without obtaining an order barring the introduction at trial of whatever testimony he might give at the hearing. Subsequently, Dr. Mayland testified to statements by defendant including the following: in his encounter with Rosie Grover he was "mean acting"; he demanded, "Why don't you show me some tit, bitch"; and he ordered, "Suck my dick." At neither the guilt nor penalty phase of trial was any of these statements admitted for its truth. But at both phases, the prosecutor repeatedly and emphatically used all of them as though they had been.

To establish ineffective assistance of counsel under the Sixth Amendment, a defendant must show deficient performance under an objective standard of professional reasonableness. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052].) He must also show prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Id.* at pp. 687, 691-694 [80 L.Ed.2d at pp. 693, 695-697].) A "reasonable probability" is not a probability that the failing "more likely than not altered the outcome of the case" (*id.* at p. 693 [80 L.Ed.2d at p. 697]), but simply a "probability sufficient to undermine confidence in the outcome" (*id.* at p. 694 [80 L.Ed.2d at pp. 697-698]).

In this case, defendant has shown deficient performance. It was professionally unreasonable for defense counsel to call Dr. Mayland at the hearing without obtaining an order barring the introduction at trial of whatever testimony he might give. Allen subsequently admitted that the failing was "inexcusably sloppy." That is the most charitable characterization of the omission.

Defendant has also shown prejudice.

Whether there is a reasonable probability of an adverse effect on the outcome of the guilt phase is a close question. It is at least arguable that the jury's guilt verdicts and its special circumstance and other findings were not tainted by defense counsel's failing. The focus of the guilt phase were the various charges and allegations. Defendant's statements to Dr. Mayland did not bear as heavily on the elements of the offenses and enhancements as on his own character. The inculpatory evidence was very strong, and the exculpatory evidence was very weak. Moreover, the superior court admonished the jurors that they could not consider defendant's statements for their truth.

By contrast, it is not a close question whether there is a reasonable probability of an adverse effect on the outcome of the penalty phase. It appears that the jury's verdict of death was in fact tainted by defense

counsel's failing. Certainly, confidence in the result is undermined. The focus of the penalty phase was in large part defendant's character. Defendant's statements to Dr. Mayland bore heavily on that issue. The aggravating evidence, which was limited to guilt-phase evidence relating solely to the crime itself, was indeed substantial. But substantial too was the mitigating evidence, which painted a sympathetic picture of defendant. The superior court did not admonish the jurors that they could not consider defendant's statements for their truth. We cannot reasonably presume that the jurors would have applied the admonition that the court had delivered at the guilt phase. Indeed, we should rather presume the opposite. A reasonable juror would have believed that since he was obligated to make a moral assessment of defendant's character in determining penalty, he was required or at least entitled to take into account defendant's statements, through which he displayed his character for all to see.

## V

For the reasons stated above, I am of the view that defendant's Sixth Amendment right to the assistance of conflict-free counsel was violated. Accordingly, I would reverse the judgment.

Appellant's petition for a rehearing was denied October 27, 1993. Mosk, J., was of the opinion that the petition should be granted.